**Herbert COHN, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 400–86C.**

United States Claims Court.

Nov. 21, 1988.

Neil B. Kabatchnick, Washington, D.C., for plaintiff. Craig M. Kabatchnick, of counsel.

John S. Groat, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant. Captain Douglas Wade, Dept. of the Air Force, of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court on cross-motions for summary judgment. Briefing was completed before transfer to this court for decision on October 4, 1988. Argument was held after the parties filed supplemental memoranda addressing authorities issued in the interim since the last brief was received.

## FACTS

The following facts are undisputed, unless otherwise indicated. Herbert Cohn ("plaintiff") comes before this court as a discharged non-commissioned officer ("NCO") of the United States Air Force (the "Air Force"). In accordance with what plaintiff considers to have been an illegal discharge, he seeks (1) back pay and constructive service from December 13, 1983, through August 20, 1985; and (2) correction of his military records (a) to void his involuntary discharge from the Air Force and four Airman Performance Reports ("APR's") and (b) to expunge from his military records any and all documents relating to the discharge. Plaintiff urges the court to set aside the denial by the Air Force Board for Correction of Military Records (the "AFBCMR" or the "correction board") of his application, pursuant to 10 U.S.C. § 1552 (1982), and to grant him the requested relief.

Plaintiff asserts multiple defects which, he claims, demonstrate the illegality of the Air Force's actions, including: (1) His discharge was accomplished in violation of AFR 39-10 (Oct. 1, 1982), in that certain APR's in his record are materially and legally in error because of their lack of objectivity and should not have been considered in the discharge proceeding; the evidence

as a whole was biased; and plaintiff's commanding officer failed to state why probation and rehabilitation were not recommended in lieu of discharge; (2) the discharge was tainted by an *ex parte* Staff Judge Advocate's Legal Review issued after the administrative board recommended discharge, but before the base commander decided to discharge plaintiff; and (3) the findings relied on in the discharge proceeding and by the AFBCMR were contrary to the evidence, arbitrary, capricious, materially and legally in error, and unjust; violated plaintiff's constitutional right to due process; and were not supported by substantial evidence.

Plaintiff had enlisted in the California Air National Guard from August 2, 1953, to January 19, 1959, and in the Air Force Reserve (the "Reserve") from January 20, 1959, to September 25, 1961. He reenlisted in the Reserve on July 14, 1979, and was ordered to active duty on October 8, 1980. During the combined rating period of October 13, 1980, through September 14, 1983, plaintiff was assigned to duty as a Medical Service Technician at the Air Force Clinic, Aviano Air Base, Italy.

The administrative record documents as early as August 14, 1981, incidents of plaintiff's misconduct. Apparently, on that date plaintiff had exchanged shifts with another technician although a request for the change had been disapproved earlier. Plaintiff endorsed on the Letter of Counseling memorializing the incident the following comment: "This is typical of the bullshit emanating from this band-aid station & therefore need not be dignified with a response." As detailed in the discussion of evidence considered in discharging plaintiff, from this opening salvo plaintiff's performance was checkered. However, his commanding officer, First Lt. Michael F. Hebert, on July 7, 1983, approved plaintiff's request for reassignment to Wilford Hall Medical Center, Lackland Air Force Base, Texas. In so doing, First Lt. Hebert submitted a report that date stating that he had contacted plaintiff's immediate supervisor, Master Sgt. George S. Milis, that he had reviewed plaintiff's performance, and that plaintiff was qualified for the assign-

ment to begin on October 12, 1983. The July 7 report also states that First Lt. Hebert did not intend to take administrative action against plaintiff. Between July 7, 1983, when First Lt. Hebert approved plaintiff's reassignment to Lackland Air Force Base and September 15, 1983, when he recommended that plaintiff be discharged, plaintiff was cited or counseled for misconduct on six occasions.

On August 4, 1983, orders issued for plaintiff's reassignment to Lackland Air Force Base. On August 18, 1983, Assistant Staff Judge Advocate Captain Richard Henderson conducted a Pre–Review of plaintiff's file. Captain Henderson recommended that plaintiff be allowed to move to another installation, noting that "[i]t is also unlikely that a discharge board would recommend a discharge on the basis of such conflicting testimony." Staff Judge Advocate Major Douglas R. Everley concurred with Captain Henderson. On August 31, 1983, Master Sgt. Milis recommended plaintiff's non-selection for reenlistment under the selective reenlistment program, although plaintiff was eligible for selective reenlistment consideration. Then, on September 15, 1983, First Lt. Hebert initiated discharge proceedings pursuant to AFR 39–10, recommending discharge. His Recommendation for Discharge stated in pertinent part:

1. I recommend that TSgt Herbert Cohn, FR561–46–8474, be discharged from the United States Air Force for unsatisfactory performance, in particular failure to demonstrate the qualities of leadership required by his grade. The authority for my recommendation is AFR 39–10, paragraph 5–26(3). . . .

. . . .

3. Before recommending this discharge, I have considered all rehabilitative efforts noted in paragraph 1 of this letter.

4. I have counseled TSgt Cohn as required by AFR 110–1.

5. I do not recommend probation and rehabilitation according to Chapter 7.

Plaintiff was alerted to this finding and acknowledged receipt of the notice on September 15.

On October 25, 1983, plaintiff was notified that, in accordance with his request for a hearing, an Administrative Discharge Board (the "Discharge Board") of officers would convene on October 26, 1983, at Aviano Air Base.

Prior to the scheduled hearing, the Discharge Board addressed two matters in a "pre-board" hearing. First, the parties moved for the admission into evidence of their exhibits. Although the Discharge Board denied the admission of a few exhibits, both parties successfully introduced many pieces of documentary evidence. Second, the Discharge Board officers underwent *voir dire* questioning.

At the conclusion of a two-day hearing and after considering all the previously admitted evidence, as well as the live testimony of four witnesses called by plaintiff, a majority of the members voted to honorably discharge plaintiff from the Air Force. The Discharge Board recommended:

> That Technical Sergeant Herbert Cohn be discharged because of unsatisfactory performance, in particular, his failure to demonstrate the qualities of leadership required by his grade, with an honorable discharge and that he not be offered rehabilitation opportunities with a conditional suspension of his discharge. Rehabilitation opportunities should not be offered for the following reasons: During his tenure at Aviano Air Base, Italy, Technical Sergeant Cohn failed to properly transition into the active force. His inability to adhere to basic military rules and procedures, coupled with his failure to show noted improvement after two years of counseling, reflects that he should not be offered rehabilitation opportunities.

On November 16, 1983, Major Everley conducted a Legal Review of the Administrative Discharge Action in order to advise the base commander of his options based on the discharge proceedings. In his review Major Everley summarized the evidence relied upon by the Air Force and that relied upon by plaintiff. After briefly discussing the alleged errors or irregularities asserted by plaintiff's military counsel (a challenge for cause to the Discharge Board's president and denial of a request for a verbatim transcript), Major Everley concluded that all plaintiff's procedural and substantive rights had been protected and that the case was legally sufficient; thus, he recommended plaintiff's honorable discharge, without rehabilitation. Thereafter, on November 23, 1983, Colonel Lester P. Brown, Jr., Commander, determined that plaintiff should be discharged, noting, "I have considered probation and rehabilitation and do not deem them appropriate."

On October 22, 1984, plaintiff applied to the AFBCMR requesting that it remove from his record the APR for the period May 1, 1981, through October 28, 1981. Plaintiff subsequently sought removal of three other APR's and broadened his challenges to the discharge proceeding. The AFBCMR requested and received two advisory opinions regarding plaintiff's discharge. On November 21, 1985, the AFBCMR addressed plaintiff's application and, finding no existence of probable material error or injustice, denied plaintiff's appeal without a hearing. Plaintiff was notified of this decision by letter dated January 24, 1986. Plaintiff then sought relief in this court.

### 1. *The discharge proceeding*

Two matters that took place in the pre-board hearing are pertinent to plaintiff's claims. First, plaintiff attempted to introduce into evidence the Pre–Review letter written by Major Everley, which stated in full:

> I think this file is inclusive at best. The former clinic director's letter ... seems to sum up my analysis. I suggest we let the individual move to another installation where he may have fewer personality conflicts. It is also unlikely that a discharge board would recommend a discharge on the basis of such conflicting testimony.

The referenced June 27, 1983 letter from Colonel (Dr.) Duane F. Mabeus reads in full:

> Over a year ago I talked with you about TSgt Herbert Cohn and the possi-

bilities of him working as an IDMT. At the time he was having difficulty with his supervisors and I was receiving reports of excessive intake of alcohol. For these reasons I was reluctant to recommend him for this duty. The people at the isolated places need someone who is reliable since it is a tremendous responsibility.

I have now had an opportunity to observe TSgt Cohn for quite a long period. I have seen no instances of excessive alcohol use. He does appear to have some difficulty in a supervisory position, but has done some outstanding work for us when working in a nonsupervisory capacity. He continues to have interest in the area of IDMT and if he could be sent back to school for refresher, I think he would likely do very well. At any rate, in fairness to this individual and the good of the USAF, I think he deserves consideration for this kind of position.

The Discharge Board sustained the Air Force's objection that the letter inappropriately invaded the board's decision-making authority and refused to admit the letter into evidence.

Second, a significant exchange took place during the *voir dire* questioning of Discharge Board president Lt. Colonel Robert T. Mantor. According to the record of board proceedings, Lt. Colonel Mantor was the first member to be *voir dired* by plaintiff's Air Force counsel. The questioning proceeded, as follows:

Q.... Why don't we just go from the commander who initiates the action, recommends it, straight to the separation authority who in this case would be Colonel Brown and bypass this board process? It would be a lot faster, a lot cleaner, and we can even throw a legal review in as well. So why do we bother with this process?

A. I assume that it provides an opportunity to hear, as Paul Harvey would say, the other side of the story. Perhaps there are facts or circumstances which cannot be readily brought to Colonel Brown or brought from the personnel function to him that would require some type of review or were perhaps over-

looked. There might be facts that don't make it cut and dry as you describe.

Q....*If I tell you nothing more than the commander recommended that Sergeant Cohn be discharged, how much weight would you give that?*

A. *Considerable.*

Q. You would?

A. (Nodding head.)

Q. Without knowing anything more?

A. *Well, the commander knows him better than Colonel Brown does.* The commander deals with him, knows the circumstances, and obviously a couple of echelons above that in Colonel Brown's case doesn't necessarily have that data base or that information. *So I would think that the commander's input would be rather credible.*

Q. Without knowing the basis for the action but just knowing the fact that the commander recommended it, it appears to me, if that's your viewpoint, that you would already be leaning toward recommending discharge.

A. That could very well be having been a commander for three years.

Q. So as you sit here today ...

A. A commander that has Article 15 authority, for example, is a magistrate. So I think he takes upon himself a couple of things when he takes on that responsibility. So I would tend—personally I would tend to look at it that way having been one.

Q. Um hum.

A. So that's why I'm being perfectly candid.

Q. Well, that's what I'm asking you to be. So, you know, regardless of what the basis of the discharge is, you feel that most commanders are experienced enough and close enough to their personnel so that their recommendations should be given quite a bit of weight?

A. (Nodding head.)

Q. Just generally speaking what would it take you to rule against the commander or find against the commander?

A. Obviously there is a time span built into that equation. There's cause for the

commander to take that action. There's got to be cause, there's got to be a reason or he wouldn't be doing it, he wouldn't be taking it or proposing that action. So there's got to be a reason for pursuing that avenue or that course. I'm not saying—I don't know what it is, but I'm just saying that we just don't do that in limbo, we just don't do that in isolation, that it's based on something, something drastic or something ...

Q. Well, in your experience in the past do you feel that most discharge cases that are initiated should result in discharge?

A. With my three years of experience as a commander in Germany of a squadron of 260 military, I would say yes.

Q. What percentage would you say?

A. Ninety.

Q. So as you sit here today, based on past experience, you're saying that ...

A. But I'm not a commander today.

Q. That's right, but you have the experience of being a previous commander. So if I hear you correctly, Sergeant Cohn has ...

A. He's not guilty.

Q. ....*If you go by your odds, has a ten per cent change of retention?*

A. *Exactly.*

　....

Questions of Lt. Colonel Mantor by the Air Force Legal Advisor:

Q. Colonel Mantor, you answered some questions concerning your feelings towards initiation of discharge proceedings and what the commander's role was in those proceedings. If you listen to all the evidence here today and you feel that a discharge in this case is not warranted, will you vote to retain the respondent?

A. Yes.

Q. Will you keep an open mind while you listen to all that evidence?

A. (Nodding head.)

(Emphasis added.) At the conclusion of all the *voir dire* examinations, plaintiff requested an out-of-board hearing, at which his counsel challenged Lt. Colonel Mantor for cause on the grounds that the officer could not be an impartial, objective fact-finder. Without explanation the Discharge Board denied plaintiff's challenge.

In his case-in-chief before the Discharge Board, plaintiff's military counsel called four witnesses to testify in person on plaintiff's behalf. Lt. Colonel (Dr.) Italo J. Falcone testified that he served with plaintiff at the Aviano Air Base in the capacity of professional provider of medical services. According to Lt. Colonel Falcone, plaintiff was willing, knowledgeable, and capable. However, the witness continued, "Sergeant Cohn has rebelled, and has probably been his own worst enemy but this is compensatory for the situation in which he found himself...." On cross-examination Lt. Colonel Falcone admitted that he did not have the opportunity to observe plaintiff throughout the day for extended periods of time.

Plaintiff's second witness was Staff Sgt. Helen M. Isles, with whom plaintiff had also served at Aviano Air Base. Staff Sgt. Isles stated that in her subordinate position to plaintiff she had always found him helpful and faithful to Air Force regulations. Staff Sgt. Isles concluded her direct testimony examination by saying that plaintiff had not been given a chance to make the most of himself because of the constant badgering of Master Sgt. Milis and Captain Holly Horzempa. During her cross-examination, Staff Sgt. Isles stated:

I do not feel that an NCO who is unable to meet Air Force standards is a good NCO. I am not trying to say here today that all the clinic personnel in a supervisory position over Sergeant Cohn are unfair people, only Captain Horzempa and Major Miller.

Plaintiff's third witness was Captain Gary D. Milan, plaintiff's superior at Aviano Air Base. Captain Milan testified that when he first heard plaintiff was going to be working for him, he was upset. According to Captain Milan, several people, including Master Sgt. Milis and Major Patricia A. Robohn, had said negative things about plaintiff. Despite their warnings Captain Milan stated that he never had any problems with plaintiff. Instead, Captain Milan testified that certain of his superiors were

"out to get" and "totally disliked" plaintiff. In fact, Captain Milan gave non-complimentary character sketches of all plaintiff's chief accusers and specifically mentioned that because of her surly personality, Captain Horzempa had been placed in an area where she would have less contact with patients and fewer supervisorial responsibilities.

Plaintiff testified on his own behalf. According to plaintiff, he was reported for the slightest incident, worked plenty of overtime at the clinic, was involved in many extra-curricular activities on the base, and was not present during a significant portion of his final evaluation period. Plaintiff admitted that he reacted badly to the reprimands of his superiors on a few occasions by making snide comments, but noted that, in his 12½ years of military service, he had never had any problems until he arrived at Aviano. Lastly, when examined by the Discharge Board, plaintiff admitted that he did drink, but not to excess and had "absolutely not been involved with the excessive use of alcohol."

Plaintiff also introduced documentary evidence, including a Stipulation of Expected Testimony from Colonel Mabeus who was then stationed in Idaho. Colonel Mabeus was the director of the clinic at Aviano Air Base during two of the three years plaintiff served at Aviano. The stipulation stated, in pertinent part:

Very shortly after my arrival I was asked by the USAFE Nursing NCO about Herb's qualification for IDMT. At that time I had been told that Herb was in an alcohol rehabilitation program and had a problem. I felt very strongly that people at isolated sites should have only solid performers for their only source of medical care. I told CMSgt Gilchrist that I couldn't recommend TSgt Cohn because of this. However, after 2 years of my own observation I felt this was no longer a valid reason. During the two years I never observed any on-duty drinking and no unreasonable off-duty drinking. I really felt that I had been misled concerning his drinking. Before I left, I wrote to CMSgt Gilchrist and explained my change of feelings. I really

felt that I had been unfair to TSgt Cohn. It is especially bad in his case as this is the sort of environment in which he appears to function best. During the two years I received no unfavorable comments from the patients about his manner in dealing with patients, while I did receive comments from many patients that he appeared especially concerned with them. So I have no problems with his direct contact with patients with either manner or capability. During the time I was there, Herb worked in several different areas. There is no doubt that he works best in a small section where he is responsible for his own work, but not that of others. So, he has probably been denied the opportunity to work in the area where he would function best.

During the time I was there I also had to disagree with his APR raters on a couple of occasions. The degree at which they rated his competence was so extreme I could not agree with it.

Plaintiff's documentary evidence also included four affidavits submitted by plaintiff's co-workers commending plaintiff for his competence and collegiality. Of particular praise was the Affidavit of Technical Sgt. John F. Carroll, Oct. 25, 1983, in which he made three points: (1) Captain Horzempa is tactless, impatient, and unsympathetic to the needs of others; (2) Master Sgt. Milis tends to rely on his rank when dealing with others; and (3) the standards and policies concerning smoking, timeliness, and clean desktops were not consistently applied and enforced at Aviano Air Base. He concluded, "If TSgt Cohn is discharged because he is not totally compatible with the supervisory style of a few people who have worked in the clinic, I think all of our Air Force careers may be in jeopardy." The Discharge Board also received many letters of appreciation submitted by plaintiff's former co-workers and commanders. Several commendations awarded to plaintiff for scholastic achievement, good conduct, and outstanding performance of duty were also in evidence.

The Air Force did not present any live testimony in its case in chief, submitting,

instead, plaintiff's APR's and 42 items of documentary evidence, consisting principally of Letters of Reprimand and Records of Counseling. An APR relates to the evaluation of an airman's performance and potential by supervisory personnel. Four of the APR's—for the rating periods May 1, 1981, through October 28, 1981; October 29, 1981, through April 2, 1982; September 25, 1982, through December 23, 1982; and April 23, 1983, through September 14, 1983 —contained adverse comments and ratings. The APR for the rating period of May 1, 1981, through October 1, 1981, contained two sets of ratings, one from Master Sgt. Milis, the rater, and one from Major Robohn, as indorser. The indorser's job is to comment on whether or not he or she agrees with the rater's overall evaluation. When averaged, the raters' scores gave plaintiff 6 out of a possible 9. The raters recommended that plaintiff try to live up to his military obligations, *e.g.*, attending scheduled formations and appointments.

On plaintiff's APR for April 23, 1983, through September 14, 1983, his raters, Master Sgt. Milis and Major Nancy Miller, scored him 4 out of 9. The raters commented that plaintiff had performed his duties in less than a satisfactory manner, that both his attitude and administrative manners needed work, that plaintiff had not helped cover the primary care clinic in afternoons when his section was closed, and that plaintiff had difficulty working with others.

Although plaintiff did not have an opportunity to respond to these two APR's, the October 29, 1981, through April 2, 1982, and September 25, 1982, through December 23, 1982, were referral APR's. Referral APR's differ from regular APR's in that, according to regulation (AFR 39–62), APR's containing adverse comments and ratings that malaffect an airman's status in the Air Force must be referred to him for comment. On plaintiff's APR covering October 29, 1981, through April 2, 1982, Captain Horzempa was the rater, and Master Sgt. George W. Jarriel Sr.,; Major Robohn; and Colonel Mabeus served as indorsers. Plaintiff's ratings on this APR were very low: He scored 2 out of 9 from the overall rater and received a score of 3 from each indorsers. The rater commented that despite plaintiff's knowledge of his field, he had little rapport with his co-workers and had been the source of numerous complaints. The indorsers all generally concurred with Captain Horzempa and mentioned such problems as plaintiff's inability to communicate and his habit of smoking in designated non-smoking areas.

Plaintiff had responded to this adverse APR by submitting several documents rebutting the negative comments. In addition to plaintiff's own letter, addressing each comment, plaintiff offered four Observations of Performance, which stressed plaintiff's excellent qualities of responsibility and cooperation.

In similar fashion plaintiff's referral APR of September 25, 1982, through December 23, 1982, contained ratings by Captain Horzempa, the rater, and three indorsers, including Major Robohn, Colonel James M. Dennis, and Colonel Mabeus. The rater and indorsers scored plaintiff at 3. This APR stated that plaintiff had on many occasions reported for duty smelling of alcohol. Before the indorsers made their evaluations, plaintiff had submitted a letter in his behalf addressing each of the charges made against him. Plaintiff reiterated his position that certain of his supervisors discriminated against him, but admitted that he had no proof of this claim. Lastly, plaintiff provided statements from five of his former co-workers expressing admiration for plaintiff and denying that plaintiff's breath smelled of alcohol on the day in question. Despite these supportive comments, the indorsers concurred with the rater.

Of the 42 pieces of documentary evidence submitted by the Air Force, eight exhibits were categorized as Letters of Reprimand, and 19 were Letters of Counseling. The types of misconduct cited in the Letters of Reprimand ranged from the mundane, including: 1) plaintiff's disorganized desk; 2) plaintiff's unaccounted-for absence of 45 minutes; and 3) plaintiff's arrival at work at 7:17 and 7:16, on consecutive days, instead of at 7:15, as ordered, to the very

serious, including: 1) plaintiff's brusque treatment of a young boy who needed a tick removed from his arm, which treatment was not rendered in the presence of a doctor, as required; 2) plaintiff's breath smelling of alcohol when reporting on call after lunch to examine the boy; 3) plaintiff's driving of a field ambulance through a red traffic light without stopping to check traffic; 4) plaintiff's personal use of the ambulance on the same day; and 5) plaintiff's habit of smoking his pipe in designated patient areas.

The 19 Records of Counseling outlined the methods by which the Air Force attempted to reform plaintiff. In some instances the counseling became part of an official record of counseling, and in other cases the counseling took the form of briefing and training. Also, plaintiff, under Air Force regulations, had the right, and exercised it on several occasions, to submit rebuttal letters in response to his reprimands.

The Discharge Board recommended "[t]hat Technical Sergeant Herbert Cohn be discharged because of unsatisfactory performance, in particular, his failure to demonstrate the qualities of leadership required by his grade," and, as quoted above, recommended against rehabilitation in the circumstances. To support its decision, the Discharge Board listed 19 pieces of evidence, including eight Letters of Reprimand, ten Letters of Counseling, and one Formal Letter. As summarized above, this recommendation was adopted after Major Everley, Staff Judge Advocate, performed a Legal Review concurring in the Discharge Board's recommendation.

## 2. The AFBCMR proceeding

Plaintiff submitted a 113-page brief and 60 exhibits to the AFBCMR. Plaintiff provided an explanation in response to each of the 19 deficiencies relied on by the Discharge Board. Plaintiff also noted the fact that 15 of the 19 deficiencies relied on by the Discharge Board, and cited by First Lt.

Hebert as the basis for his discharge, were authored by Captain Horzempa, Major Robohn, Master Sgt. Milis, or Master Sgt. Jarriel.

In addition to his brief, plaintiff submitted two sworn statements. In a sworn statement dated January 14, 1985, Colonel Mabeus noted that plaintiff was "considerably older than most of the enlisted personnel on the clinic's staff and most, if not all, of the nurses." Colonel Mabeus also pointed out that, although he had been briefed by a party he could not identify "to the effect that Sergeant Cohn was an alcoholic," he found no basis in fact for this allegation. Colonel Mabeus had said as much in his stipulation of testimony submitted to the Discharge Board and his June 27, 1983 letter referred to by Major Everley in the latter's Pre–Review of August 8, 1983. In his 1985 statement, Colonel Mabeus was "convinced" that Captain Horzempa, Major Robohn, Master Sgt. Milis, and Master Sgt. Jarriel were " 'out to get' " plaintiff.

Master Sgt. Dale B. Nelson's sworn statement of April 9, 1985, attested to plaintiff's good character and disclaimed plaintiff's dependence on alcohol when they had worked together at Aviano Air Base. Master Sgt. Nelson identified plaintiff's main problem as the fact that these four superiors were " 'out to get' " him. The reason for their animosity, according to Master Sgt. Nelson, was " 'old man prejudice.' " Master Sgt. Nelson had not been called as a witness at the discharge hearing, nor was he asked to furnish a statement on plaintiff's behalf.

The AFBCMR considered two advisory opinions. The first was submitted by Chief, AFBCMR Advisories Branch, Billie J. Smagula, Directorate of Personnel Program Actions, Air Force Manpower and Personnel Center, Randolph Air Force Base, Texas (MPCAOB). Ms. Smagula comprehensively addressed plaintiff's challenges to his APR's.[1] According to Ms. Smagula, plaintiff failed to demonstrate the existence of "personal animus" for him

1. Plaintiff would not concede as much, but the court finds this advisory opinion singularly analytical.

by his supervisors. The seven APR's included in plaintiff's record represented the ratings and endorsements of 11 evaluators, two of whom (Col. Mabeus and Major Robohn) both rated plaintiff variously as an 8 (uncontested) and 3 (contested). She pointed out that plaintiff's high ratings were gleaned when he was not discharging supervisory responsibilities and the lower, when he was performing in nonsupervisory positions. "[T]his caused the 'divergence' in the ratings on his APRs...." Ms. Smagula also noted plaintiff's own admission that he needed improvement in the leadership area.

The second advisory opinion was submitted by Staff Master Sgt. Keith A. Seely, Airman Separations Branch, Directorate Of Personnel Program Actions, Air Force Manpower And Personnel Center, Randolph Air Base, Texas (MPCAKE). Staff Master Sgt. Seely's opinion contained (1) a brief history of plaintiff's service; (2) an outline of plaintiff's requests before the AFBCMR; (3) a listing of the 31 deficiencies in plaintiff's performance that prompted plaintiff's discharge; and (4) a paragraph discussing the posture of the case. Without any analysis Staff Master Sgt. Seely concluded that the Discharge Board complied with current separation directives and that the military record reflected no irregularities that would have resulted in injustice to plaintiff.

Plaintiff also submitted three written supplemental memoranda. The first responded to Major Everley's Legal Review of the Discharge Board's proceedings as *ex parte*. The other two contested the AFBCMR's request for and receipt of the two advisory opinions of Ms. Smagula and Master Sgt. Seely.

The January 10, 1986 Record of Proceedings for the AFBCMR's November 21, 1985 deliberation noted one irregularity, as follows:

> Although we do not find that the discharge action was rendered in violation of the governing regulation, we believe the following contentions should be addressed: (1) Applicant's commander failed to give a reason for not offering probation and rehabilitation (P & R). AFR 39–10, paragraph 7–2g, provides for the separation authority to offer P & R in any case where there seems to be a reasonable expectation of rehabilitation. *Paragraph 7–4 requires the initiating commander to consider P & R, and states that if he or (emphasis added) the administrative discharge board does not recommend P & R, the reason must be given.* It is evident from the commander's letter recommending discharge that he had considered all rehabilitative efforts made over the previous two years and that he did not recommend P & R according to Chapter 7. Subsequently, the discharge board recommended P & R and gave its reason for such recommendation.... We note that after the SJA recommendation on 18 August 1983, applicant's reenlistment was disapproved on 31 August 1983; subsequently three unfavorable statements were written on 30 and 31 August 1983; and on 9 September 1983 applicant received a letter of counseling. It appears that because of the more recent events, as well as because of the ample file of counselings and reprimands, the commander believed sufficient evidence was available on which to appropriately base administrative discharge action....

(Emphasis added.) The August 30 and 31 statements, however, had been rejected by the Discharge Board.

## DISCUSSION

■ The lengthy factual recitation in this opinion does not purport to resolve factual disputes, but, rather, to set out what the record reveals about the Discharge Board proceedings and the correction board's review of them. A decision of the AFBCMR is on review. In order to overturn the AFBCMR's decision, plaintiff must show that the decision was arbitrary, capricious, unsupported by substantial evidence, or contrary to law. *Voge v. United States*, 11 Cl.Ct. 510, 515 (1987) (citing *Alberico v. United States*, 783 F.2d 1024, 1029 (Fed.Cir.1986) (citing cases)), *vacated in part on other grounds*, 844 F.2d 776 (Fed.Cir.), *cert. denied*, — U.S. —, 109

S.Ct. 365, 102 L.Ed.2d 355 (1988). Defendant views judicial review of the discharge proceeding as an impermissible intrusion into the Air Force's discretionary assessment of plaintiff's suitability for military service. This argument would eradicate established case law that discharge proceedings are reviewable when challenged on the basis that regulations have been violated. *See, e.g., Bray v. United States*, 207 Ct.Cl. 60, 80, 515 F.2d 1383, 1394–95 (1975); *Denton v. Secretary*, 483 F.2d 21, 25 (9th Cir.1973), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974); *Clackum v. United States*, 148 Ct.Cl. 404, 296 F.2d 226 (1961) (where discharge review board fails to objectively weigh evidence as required by regulations, discharge clearly reviewable by judiciary). In a case such as the one at bar, the court is reviewing a discharge proceeding only through the prism of a correction board. The latter's assessment of the discharge frames and delimits the judicial review.

1. Plaintiff contends that four of his APR's, as non-objective evaluations of his performance, should not have been before the Discharge Board. Thus, according to plaintiff, because his discharge was based in part on these "biased" APR's, the discharge proceeding was flawed and the AFBCMR's denial of his application was arbitrary, capricious, and contrary to law.

■ The process of officers evaluating other officers is inherently subjective and neither the military boards nor this court will interfere unless one party presents clear and convincing evidence of factors adversely affecting the ratings which had no business being in the rating process. *Guy v. United States*, 221 Ct.Cl. 427, 433, 608 F.2d 867, 871 (1979) (citing *Savio v. United States*, 213 Ct.Cl. 737, 553 F.2d 105 (1977); *Tanaka v. United States*, 210 Ct.Cl. 712, 538 F.2d 348 (1976), *cert. denied*, 430 U.S. 955, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977)). In addition, an officer's challenge to an APR must overcome the strong, but rebutable, presumption that administrators of the military discharge their duties correctly, lawfully, and in good faith. *Hary v. United States*, 223 Ct.Cl.

10, 17, 618 F.2d 704, 707 (1980). In order to prevail on his claim plaintiff

> must do more ... than merely allege or prove that an [APR] seems inaccurate, incomplete or subjective in some sense. The showing is not enough where an allegation, even if proved fails to establish the presence of "factors adversely affecting the ratings which had no business being in the rating process," ... or where there is no clear violation of a specific objective requirement of statute or regulation, or where there is no misstatement of a significant hard fact.

*Hary*, 223 Ct.Cl. at 17, 618 F.2d at 708. Plaintiff's burden is to prove (1) that his APR's were somehow subjective or incomplete and contained negative factors which had no business being in the rating process, or (2) that his APR's contained misstatements of significant hard fact.

■ For plaintiff to demonstrate that his APR's were tainted unlawfully with subjective comments, plaintiff must do more than merely allege prejudice and bias; he must create a nexus between the existence of negative factors having no business in the rating process and the responsible rater. *See Wales v. United States*, 14 Cl.Ct. 580, 593 (1988) (plaintiff failed to show prejudice in rating through affidavits which only averred that a commanding officer influenced the rater's decision, absent an affidavit of the officer or one purporting to directly quote officer), *appeal docketed*, No. 88–1417 (Fed.Cir. May 25, 1988); *Hary*, 223 Ct.Cl. at 18 n. 7, 618 F.2d at 708 n. 7 (plaintiff's mere assertion that rater expressed dislike for plaintiff on single occasion not serious or significant enough to prove personal animosity and bias).

An example of a case where plaintiff successfully creates this nexus is *Stewart v. United States*, 222 Ct.Cl. 42, 611 F.2d 1356 (1979). Plaintiff in *Stewart* challenged the validity of two of his ratings because, according to plaintiff, they were the product of personal animosity and bias. The prejudice of the raters was allegedly caused by the fact that plaintiff had a Japanese wife. At his discharge hearing, plaintiff pointed to several statements of

knowledgeable persons citing specific incidents supporting this allegation. The United States Court of Claims remanded the case to the correction board with instructions to make a finding with regard to this issue. *Stewart,* 222 Ct.Cl. at 47, 611 F.2d at 1361–62.

Similarly, in *Skinner v. United States,* 219 Ct.Cl. 322, 327, 594 F.2d 824 (1979), plaintiff alleged that his ratings on two performance reports were the product of bias. Plaintiff's rater, before rating plaintiff, discussed the upcoming evaluation with his own superior. The rater's superior dissuaded the rater from giving plaintiff a high mark because the deputy of operations, who did not like plaintiff, certainly would downgrade the evaluation. Even though the superior had no personal knowledge of plaintiff, the rater accepted the superior's judgment. In a letter, which later became part of the administrative record, the deputy of operations specifically denied that he disliked plaintiff and expressed dismay that plaintiff had not been promoted. Thus, plaintiff's career was ruined through no fault of his own, but because of improper bureaucratic bungling. Finding the rater's superior's comments equal to a factor having no business in the rating process, the Court of Claims awarded plaintiff back pay and restoration to active duty status. *Skinner,* 219 Ct.Cl. at 334, 594 F.2d at 831–32.

■ In the case at bar, plaintiff has failed to create a nexus between the alleged animosity of his superiors, resulting in the existence of factors having no business in the ratings process, and his unfavorable APR's. Captain Milan had testified before the Discharge Board that plaintiff's superiors were "out to get" him and "totally disliked him." Master Sgt. Nelson's sworn statement before the AFBCMR points to "old man prejudice" as the basis for the ill-will corroborated by Colonel Mabeus and others. However, plaintiff does not create a nexus, with clear and convincing evidence, demonstrating that his low ratings were the product of "old man prejudice." Not one of the many statements submitted by plaintiff identifies

a single incident manifesting this type of prejudice, nor does plaintiff show the existence of prejudice through quotations attributable to plaintiff's superiors. The assertions of ill-will themselves are opinions of the superiors' motivations, not charges that any of them made statements to the effect that they personally disliked plaintiff or were out to get him.

Plaintiff unsuccessfully points to the anti-alcoholic bias of his superiors as another factor which had no business being in the rating process. In Colonel Mabeus' expanded statement submitted to the AFBCMR, for example, he recalls that, before he met plaintiff, someone had warned him about plaintiff's addiction to alcohol. However, unlike the situation in *Skinner,* where plaintiff identified the rater's superior as the prejudiced declarant, Colonel Mabeus cannot recall exactly who told him that plaintiff was an alcoholic. This is certainly not the kind of "error and injustice that cried aloud for relief and that Congress had in mind when creating correction boards." *Skinner,* 219 Ct.Cl. at 329, 594 F.2d at 828. Thus, plaintiff again fails to link his allegations of bias to concrete examples of its infiltration into the rating process.

In addition, the fact that Colonel Mabeus, in retrospect, believes that his concurrence in the low APR's should be voided and expunged from plaintiff's records because he considers "the discharge of Sergeant Cohn to have been a grievous error and, most certainly, an injustice," Statement of Col. Duane F. Mabeus, Jan. 14, 1985, lends no support to plaintiff's request for judicial intervention. This court, in *Voge,* citing *Hary,* 233 Ct.Cl. at 17–18, 618 F.2d at 708, dealt with this argument, as follows:

> Nor is it enough to impel us to act that the rater may now say that he scored the claimant too low. In *Tanaka v. United States,* 210 Ct.Cl. 712, 538 F.2d 348 (1976), *cert. denied,* 430 U.S. 955, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977), we held that rater's statement that his opinion had changed and that he would now rate plaintiff higher, absent any misstatements [of] fact in the OER, did not

tender a triable issue on the accuracy of an OER. In *Savio v. United States*, 213 Ct.Cl. 737, 553 F.2d 105 (1977), the plaintiff supported a challenge to the accuracy of an OER with a statement by the rater that the rating was not consistent with the rater's high regard for the plaintiff, blaming this on his slight personal attention to the plaintiff's performance of duties, words of caution he had received from his superiors on inflating numerical ratings in OERs and his failure to include pertinent information in the report. Again, there were no allegations of misstatements of hard fact in the original rating, and we refused to order the removal of the challenged OER. *Voge*, 11 Cl.Ct. at 515. Significantly, Colonel Mabeus does not say that his ratings were not consistent with his high regard for plaintiff, only that given the unfairness of plaintiff's other evaluators the ratings should not stand.

Finally, in the present case, plaintiff does not claim that his APR's contain misstatements of hard fact. Plaintiff does not assert that the events reported in his referral APR's never happened, only that he has explanations for each occurrence. One hard fact contested by plaintiff is whether or not his breath smelled of alcohol when he reported for work. Plaintiff submitted letters from several of his former co-workers stating that his breath never smelled of alcohol. However, the evidence before the Discharge Board—in the APR's and the underlying citations of misconduct—was that plaintiff had reported to work with alcohol on his breath. Even though the Discharge Board for the most part was weighing documentary evidence against other documentary evidence and the only live testimony was favorable to plaintiff, plaintiff's evidence did not impeach or challenge every documented report that plaintiff had appeared for duty with alcohol on his breath or otherwise manifested the use of alcohol. For example, the mother of the boy with the tick complained in writing on July 5, 1983, that plaintiff had alcohol on his breath and his hands were shaky.

Plaintiff forsook an opportunity to offer his written comments on the July 5, 1983 Record of Counseling.[2] Plaintiff provided an explanation to the AFBCMR (that he reported on call after consuming a glass of wine with lunch), but the Discharge Board considered the incident as unrebutted. Even if plaintiff had controverted every instance, the Discharge Board's fact finding, even on a cold record, is entitled to deference in evaluating conflicting evidence relating to the fitness of servicemen. *See Hambsch v. Department of Treasury*, 796 F.2d 430, 436 (Fed.Cir.1986); *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed.Cir.), *cert. denied*, 479 U.S. 853, 107 S.Ct. 188, 93 L.Ed.2d 121 (1986). In this case the Discharge Board had before it not only plaintiff's APR's, but also reports that were later used as the basis of unfavorable comments in the APR's.

Impressive to the court is the AFBCMR's endeavor, through the Smagula advisory opinion and the discussion in the January 10, 1986 AFBCMR decision, to scrutinize plaintiff's APR's for indications of bias. As recognized by Colonel Mabeus in his stipulated testimony of October 26, 1983, plaintiff "works best in a small section where he is responsible for his own work, but not that of others...." Colonel Mabeus' earlier letter of June 27, 1983, acknowledges that plaintiff "does appear to have difficulty in a supervisory position." Substantial evidence supports a reconciliation of the divergent APR's on the basis that plaintiff received higher ratings when he performed in a nonsupervisory capacity. Plaintiff's analysis that he suffered at the hands of the quartet of biased rating officials is diminished by the fact that two of the evaluators concurred in both high and low ratings, as pointed out in both the advisory and AFBCMR opinions.

The AFBCMR fully credited Colonel Mabeus' expanded statement and Master Sgt. Nelson's statement as a further basis for the contentions of plaintiff's counsel that the four raters "'kept book on him,'" "'were out to get him,'" and had "'personal animus'" toward plaintiff. However,

---

**2.** The Record of Counseling does not mention shaky hands.

the correction board permissibly accorded these statements diminished weight in view of Colonel Mabeus' earlier mixed assessments of plaintiff's performance and the evidence already considered, and not deemed persuasive, by the Discharge Board concerning the bias of these four individuals.

■ 2. The record of the discharge proceedings displays thorough, imaginative legal representation by plaintiff's military counsel, Captain Michael J. Rollinger, Area Defense Counsel, although plaintiff suggests otherwise. Military counsel conducted a probing *voir dire* of the Discharge Board's president, Lt. Colonel Mantor. Captain Rollinger also sought to introduce Captain Henderson's August 18, 1983 Pre–Review, which, because of conflicting evidence, suggested that plaintiff be reassigned, as previously approved, instead of discharged. In response to Captain Rollinger's objection, the Discharge Board rejected the Pre–Review, taking the position that it invaded the province of the members of the Discharge Board. After the hearing military counsel requested a verbatim transcript of the *voir dire* to support a challenge of bias and impartiality on the part of the presiding officer (which was provided), and a transcript of the entire proceedings to demonstrate that the evidence was insufficient.

The post-hearing Legal Review prepared by Major Everley on November 16, 1983, addressed military counsel's objections and concluded that the challenge for cause was not substantial and that plaintiff was not entitled to a verbatim transcript of the proceedings. The AFBCMR discussed the analysis of the Legal Review and deemed it correct. Lt. Colonel Mantor's *voir dire* testimony fairly depicts open-mindedness to consider the evidence, and there is no requirement that a verbatim transcript be furnished. *Alberico v. United States*, 783 F.2d at 1025 (Claims Court lacks jurisdiction over unequal treatment challenges unless statute, regulation, or constitutional provision confers substantive right of recovery).

The AFBCMR did not address plaintiff's argument that the Discharge Board should have admitted Captain Henderson's favorable Pre–Review. However, the AFBCMR considered the Pre–Review in the context of plaintiff's argument that Major Everley, who authorized the Legal Review finding no error in the discharge proceeding, had approved Captain Henderson's recommendation against discharge. This consideration was sufficient. There is no requirement as a matter of procedure, evidence, or due process that the Pre–Review be made part of the record in a discharge proceeding.

■ 3. Plaintiff argues that the submission of the *ex parte*, post-discharge-hearing Legal Review of Major Everley to the base commander violated plaintiff's constitutional right to due process. Plaintiff, however, fails to discuss the fact that a Legal Review of a discharge is required in an AFR 39–10 proceeding. AFR 39–10 ¶ 6–17(b) provides, in pertinent part:

> On receipt of administrative discharge board proceedings, the convening authority:
>
> (1) Ensures that any special processing requirements are met ...
>
> (2) Obtains a review for legal sufficiency from the staff judge advocate and adds it to the case file;
>
> (3) Examines the report to ensure that the findings and recommendations are appropriate.

Paragraph 6–19, entitled "Action By the Separation Authority," provides that

> [t]he separation authority:
>
> (a) Obtains a review for legal sufficiency from the staff judge advocate;
>
> (b) Adds the legal review to the case file.

Finally, it is not the Air Force's responsibility to ensure that plaintiff receives a copy of the Legal Review. AFR 35–6 ¶ 9 & attachment 3 (Oct. 12, 1982), contain a Discharge Review Fact Sheet. The Fact Sheet explains how a discharge proceeding is instituted, how an airman should respond, and how he can get a copy of his case file. Step 2 of the Fact Sheet, for example, provides:

While it is not a requirement for you to get a copy of your records, it may help you in preparing your discharge appeal or in discussing your case with a counsel or representative and understanding the official reason for your discharge. If you decide to request a copy of your records, they are available at no charge to you.

The Fact Sheet goes on to explain exactly how a plaintiff should go about requesting a copy of his records.

These regulations make two points: (1) that the Legal Review becomes part of the case file, and (2) that it is the airman's responsibility to acquire copies of all documents that become part of the case file. Plaintiff does not contend that the Air Force failed to make the Legal Review part of his case file. The AFBCMR rejected plaintiff's argument that the Legal Review was conducted *ex parte* and noted the absence of a regulatory requirement that an airman receive a copy of the Legal Review prior to discharge.[3] As the Legal Review was a mandatory procedure, confined to the record which did not interject new law or evidence, the AFBCMR correctly deemed it not *ex parte* and disclaimed any regulatory requirement that plaintiff be provided a copy before the discharge became final. *Alberico*, 783 F.2d at 1025.

■ 4. Plaintiff also argues that his discharge was not based upon a balanced consideration of all the evidence available and presented. As already noted, however, the Discharge Board relied on 19 pieces of evidence in making its decision, including eight letters of reprimand, ten letters of counseling, and one formal letter. The AFBCMR's decision reflects that it reviewed the entirety of plaintiff's submission and the complete record of the discharge proceeding.

Plaintiff relies heavily on *Sanders v. United States*, 219 Ct.Cl. 285, 594 F.2d 804 (1979), for its proposition that the AFBCMR abused its discretion. However, *Sanders* is readily distinguishable. The correction board in *Sanders* voided plain-

tiff's Officer Effectiveness Report and, at the same time, affirmed plaintiff's passover for promotion. Plaintiff appealed to the Court of Claims, arguing that the correction board's actions constituted an abuse of discretion. The court ruled that the board's failure to "excise the passovers, prejudiced plaintiff's promotion opportunities and further compounded the original error or injustice." *Sanders*, 219 Ct.Cl. at 289–90, 594 F.2d at 805. The evidence before the Discharge Board in the present case does not contain the signs of injustice that the court found so obvious in *Sanders*. Nor, except as discussed in part 5 of this opinion, does the AFBCMR's assessment of that evidence demonstrate probable material error or injustice.

5. Plaintiff's most substantial challenge to the discharge proceeding and the AFBCMR's review is that the Air Force failed to follow its own elaborate regulatory schema, AFR 39–10, ch. 5, which fosters probation and rehabilitation as preferred alternatives—and their consideration a mandatory prerequisite—to discharge.

AFR 39–10, ¶ 5–2 provides, in pertinent part:

> *Preprocessing Rehabilitation.* Airmen should, as a rule, be given an opportunity to overcome their deficiencies before discharge action starts. A commander's effort to rehabilitate the airman may include formal or informal counseling . . . a change in duty assignment . . . additional training or duty, retraining, or other administrative actions. . . .

Paragraph 5–27 reads:

> *Preprocessing Actions:*
>
> a. *Do not start discharge action based on unsatisfactory performance until the airman has been formally counselled about the deficiencies and has had a chance to overcome them.* The counseling and rehabilitation requirements of paragraph 5–2 are particularly important in these cases. Because

---

**3.** It is unclear whether plaintiff could have requested the Legal Review dated November 16,

1983, before Colonel Brown made the final discharge decision on November 23, 1983.

military service is not like any civilian occupation, a member should not be discharged for unsatisfactory performance *until there have been reasonable efforts at rehabilitation*. An airman performance report (APR) directed by the commander according to AFR 39–62, volume I, table 3–1, may help a commander evaluate all aspects of a member's performance when discharge under this provision is under consideration.

(Emphasis added.)

 Although plaintiff contends that the record of counseling is insufficient, the AFBCMR had before it substantial evidence admitted before the Discharge Board that plaintiff had been counselled for two years prior to discharge for lack of leadership qualities. Contrary to plaintiff's argument, the regulations do not mandate a change in duty before discharge, nor does plaintiff provide any authority standing for the proposition that approval of a reassignment (and issuance of orders to accomplish it) void or somehow negate initiation of subsequent discharge proceedings. What plaintiff persuasively urges, however, is that First Lt. Hebert, plaintiff's commanding officer, failed to explain why—after having approved plaintiff's reassignment on July 7, 1983—he changed his mind and recommended discharge as of September 15, 1983.

AFR 39–10, ¶ 7–4 provides, in pertinent part:

> *Documenting Consideration of P & R* [probation and rehabilitation]. If the reason for discharge is exceeding weight standards, unsatisfactory performance, or misconduct, the case file must show that P & R was considered by the initiating commander, the board members if a hearing is involved, and the separation authority. *If the initiating commander or administrative discharge board does not recommend P & R, the reason must be given.* A separation authority who disapproves a recommendation of P & R must state the reasons for the decision.

(Emphasis added.) As recited in the facts of this opinion, plaintiff's commanding officer, the Discharge Board, and the separation authority (the base commander), each stated that rehabilitation opportunities had been considered. The Discharge Board stated why P & R should not be offered:

> During his tenure at Aviano Air Base, Italy, Technical Sergeant Cohn failed to properly transition into the active force. His inability to adhere to basic military rules and procedures, coupled with his failure to show noted improvement after two years of counseling, reflects that he should not be offered rehabilitation opportunities.

However, plaintiff's commanding officer, in initiating discharge, only stated that he considered rehabilitation efforts, had counseled plaintiff, and did not recommend probation and rehabilitation.

If this court were sitting as an original matter, it would not interpret AFR 39–10 ¶ 7–4 to require that First Lt. Hebert give his reason for not recommending probation and rehabilitation, since the regulation speaks in the disjunctive and the Discharge Board set forth its reasons adequately. However, the AFBCMR was of another view. Although it "did not find that the discharge action was rendered in violation of the governing regulation," the correction board noted that plaintiff's commanding officer "failed to give a reason for not offering probation and rehabilitation" as provided by ¶ 7–4. At this point the chronology of events becomes important. On July 7, 1983, First Lt. Hebert approved plaintiff's reassignment. On August 18, 1983, Captain Henderson undertook a Legal Review of plaintiff's file and recommended that plaintiff be moved to another installation. At this time, therefore, administrative discharge was not under consideration. According to the AFBCMR, "three unfavorable statements" were written about plaintiff on August 30 and 31, and September 9, 1983. On September 15, 1983, First Lt. Hebert recommended plaintiff's discharge. What was the reason for First Lt. Hebert's change of position? The correction board decision reasoned:

> It appears that because of the more recent events, as well as because of the ample file of counselings and repri-

mands, the commander [First Lt. Hebert] believed sufficient evidence was available on which to appropriately base administrative discharge action....

The AFBCMR erred here.

The Discharge Board did not list the August 30 and 31 incidents as a basis for discharge, although they had been included in First Lt. Hebert's recommendation. Thus, the correction board charted its own course to substantiate that probation and rehabilitation were not warranted by three events occurring subsequent to the favorable Pre–Review of August 18, 1983, two of which were rejected by the Discharge Board. Its action must be measured by what the AFBCMR did, not what it might have done.[4] *SEC v. Chenery Corp.*, 318 U.S. 80, 93–94, 63 S.Ct. 454, 461–62, 87 L.Ed. 626 (1943).

In the September 9, 1983 Record of Counseling, the only one cited by the Discharge Board occurring after the Pre–Review, Master Sgt. Milis charges plaintiff with 45 minutes of unauthorized absence after attending a Sexual Harassment Awareness Training Class. The correction board's error is significant given the fact (argued to it by plaintiff, but not addressed by the AFBCMR) that First Lt. Hebert had approved plaintiff's reassignment on the basis of a record including incidents of more gravitas. In fact, the incidents occurring before July 7, 1983, when First Lt. Hebert approved plaintiff's reassignment to Lackland Air Base, and before August 18, 1983, when the Staff Judge Advocate recommended against discharge, included all the serious charges against plaintiff. Because the AFBCMR attached such significance to the Pre–Review recommendation against discharge, the AFBCMR should make its own assessment of the record.

It would be improper for this court to place curative reliance on the September 9, 1983 report alone to demonstrate First Lt. Hebert's reliance on "more recent events."

Unlike in *Wales*, 14 Cl.Ct. at 11, wherein the correction board admitted its own error, the question is not whether a correction board error is serious and prejudicial to plaintiff. *Sanders*, 219 Ct.Cl. at 298, 594 F.2d at 811, but whether the court should substitute its view of the "recent events" for that of the factfinder.

For the courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review. If the action rests upon an administrative determination—an exercise of judgment in an area which Congress has entrusted to the agency—of course it must not be set aside because the reviewing court might have made a different determination were it empowered to do so. But if the action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law. In either event the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained. "The administrative process will best be vindicated by clarity in its exercise." *Phelps Dodge Corp. v. [NLRB*, 313 U.S. 177, 197, 61 S.Ct. 845, 853 85 L.Ed. 1271 (1941)].

*Chenery*, 318 U.S. at 94, 63 S.Ct. at 462.

The AFBCMR pointed out that the Air Force failed to follow its own regulations. The court does not hold that an initiating commander's failure to give his reasons for denying probation and rehabilitation tarnishes a AFR 39–10 discharge proceeding. But the correction board's approach—that the commanding officer should explain why discharge was recommended within a month after the Pre–Review advised against discharge—even if not required by the letter of the regulations, makes eminent sense. If probation and rehabilitation, valued goals of AFR 39–10 ch. 5, have substance, a decision proximate in time countermanding the same decisionmaker's

---

4. At argument defendant conceded that First Lt. Hebert's failure to give his reason for not recommending probation and rehabilitation was "administrative error that clearly could have been corrected if properly raised." This concession misses the point. The correction board itself believed that the record should show that the error was harmless.

determination that discharge is inappropriate should also be explained.

Because this court does not sit on a "sort of super Correction Board," *Reale v. United States*, 208 Ct.Cl. 1010, 1013, 529 F.2d 533, *cert. denied*, 429 U.S. 854, 97 S.Ct. 148, 50 L.Ed.2d 129 (1976), a remand is ordered for the limited purpose stated. *See Etheredge v. United States*, 8 Cl.Ct. 736, 742 (1985) (remand to correction board).

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment is granted in part consistent with this opinion, and plaintiff's cross-motion is granted only to the extent of the remand and any subsequent proceedings ordered herein and is otherwise denied.[5] Accordingly,

IT IS ORDERED, as follows:

1. Pursuant to RUSCC 60.1(a)(1), this case is remanded to the AFBCMR to convene a panel of board members to review the record in this case as it is presently constituted.

2. The AFBCMR shall answer and provide a discussion with respect to the question whether the record before the Discharge Board after the Pre–Review of August 18, 1983, adequately explains the initiating commander's reasons for not recommending probation and rehabilitation.

3. Since the AFBCMR has an adequate record before it to make this determination, no need appears for plaintiff to make any further submission.

4. The AFBCMR may order relief as it deems appropriate.

5. The Clerk of the Court shall transmit this order to the AFBCMR. Proceedings in this court are stayed until January 23, 1989. During this stay, the AFBCMR shall issue and transmit its decision to the Clerk of the Court.

6. Pursuant to RUSCC 1(a)(2), 77.1(a), (b)2, any further proceedings pursuant to RUSCC 60.1(b)(4) shall be conducted on an expedited basis, as follows:

a. The notices required by (b)(4) shall be served by hand and filed by January 30, 1989.

b. Should either party require further proceedings, that party shall file and serve by hand a supplemental memorandum not to exceed 20 pages by February 15, 1989.

c. Responsive briefs shall be filed and served by hand by February 24, 1989.

---

5. Plaintiff's other arguments have been considered and found to be without merit.