**Anthony L. HENSON, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 90–737C.**

United States Claims Court.

Dec. 23, 1991.

Mark J. Ivandick, Clarksville, Tenn., for plaintiff.

James M. Kinsella, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Capt. Jill M. Grant, Office of the Judge Advocate General, U.S. Army, of counsel.

## OPINION

NETTESHEIM, Judge.

■ This case is before the court after argument on defendant's motion for summary judgment and plaintiff's opposition.[1] Whether a board for the correction of military records erred in denying plaintiff relief turns upon whether the military impermissibly singled plaintiff out for drug testing.

### FACTS

The following facts derive from the administrative record and are undisputed. Anthony L. Henson ("plaintiff") enlisted in the United States Army (the "Army") on February 7, 1980, serving on active duty until December 3, 1984, when he was separated pursuant to Army Regulation ("AR") 635–200 ¶ 14–12c, d(1) (Oct. 15, 1984), for a first-time drug offense. Plaintiff's separation occurred prior to August 12, 1985, his scheduled date of separation. He was issued a General Discharge pursuant to AR 635–200 ¶ 3–7b(1).[2]

From May 4, 1983, to September 7, 1984, several urinalysis specimens were collected

---

1. Review of a decision by a military correction board is confined to the record. *See Long v. United States,* 12 Cl.Ct. 174 (1987) (order denying discovery request). The review is undertaken through cross-motions for summary judgment. RUSCC 56.

2. AR 635–200 ¶ 3–7b(1) provides in full: "A general discharge is a separation from the Army under honorable conditions. When authorized, it is issued to a member whose military record is satisfactory but not sufficiently meritorious to warrant an honorable discharge."

from plaintiff pursuant to AR–600–85b(1) (Feb. 11, 1983), providing for "Commander-directed" tests. These tests are ordered (a) when the Commander has a reasonable suspicion that a soldier is using a controlled substance, (b) as part of a search and seizure under the Military Rules of Evidence ("MRE"), or (c) as part of a unit inspection. AR 600–85b(1) provides, in pertinent part:

Commanders may direct individual servicemembers, part of units, or entire units to submit to urine testing in one or more of the ways listed below. The decision to test is a command judgment. Urine tests will be conducted at the unit, or elsewhere the commander directs....

(a) When there is reasonable suspicion a member is using a controlled substance:

1. A urine test for the valid medical purpose of determining the member's fitness for duty....

2. A urine test to ascertain whether a member requires counseling, treatment, or rehabilitation for drug abuse....

(b) A urine test as a search or seizure under Military Rules of Evidence 312, 314, 315 and 316.

(c) A urine test as part of the unit, or entire unit, as an inspection under Military Rules of Evidence 313 for the purpose of preserving the health of the servicemembers inspected (Military Rule of Evidence 312(f)), or for any other inspection purpose.

The Army recorded plaintiff's tests, as follows:

| Date | Positive | Negative | Untested | None Provided |
|------|----------|----------|----------|---------------|
| May 4, 1983 | X | | | |
| Oct. 6, 1983 | | X | | |
| Oct. 11, 1983 | | | X | |
| Jan. 5, 1984 | | X | | |
| Jan. 11, 1984 | | | | X |
| Jan. 20, 1984 | | X | | |
| Jan. 25, 1984 | | | | X |
| Aug. 21, 1984 | X | | | |
| Sept. 7, 1984 | | X | | |

Based on the results of the May 4, 1983 urinalysis, plaintiff was offered and accepted nonjudicial punishment. Additionally, the Army barred him from seeking reenlistment on February 29, 1984. After the August 21, 1984 urinalysis, plaintiff was once again offered and subjected to nonjudicial punishment for illicit use of marijuana. His punishment included a demotion of grade from E5 (Sergeant) to E1 (Private First Class). Plaintiff did not appeal either action taken against him.

On November 19, 1984, Captain Kyle L. Edmonds notified plaintiff that he recommended initiating separation proceedings against plaintiff, citing as evidence the results of his urinalysis tests. Colonel James R. Harding approved the recommendation on November 26, 1984, and directed that a General Discharge Certificate be issued to plaintiff. Ultimately, plaintiff received a General Discharge on December 3, 1984.

Concerned about the accuracy of its toxicology and drug testing program, the Army convened a "Blue Ribbon" Panel in 1983 to review the administrative and scientific procedures then in use by Army laboratories. Although the Panel determined that the testing procedures were sufficient to meet the objective of identifying substance abuse with tolerable accuracy, it also concluded that a percentage of previously reported positive urinalysis results could not be used to support disciplinary or administrative action.

Accordingly, the Army Deputy Chief of Staff for Personnel assembled a Urinalysis Records Review Team to examine urinalysis results obtained between April 27, 1982,

to October 31, 1983. All persons who had tested positive within that timeframe, including plaintiff, were notified that they now had a right to apply to the Army Board for the Correction of Military Records (the "ABCMR" or the "board"). Plaintiff availed himself of this opportunity, seeking correction of his military records to reflect reinstatement and requesting that all references to his 1983 urinalysis, including his nonjudicial punishment, be eradicated from his records. Plaintiff's reasoning for this latter request was based on the Panel's finding that the results of his 1983 urinalysis could not be used scientifically to support disciplinary action against him due to imprecise and inadequate testing or deficiencies in the supporting chain of custody documents. He did not challenge his 1984 urinalysis in this application to the ABCMR.

On April 23, 1986, the ABCMR ruled that the 1983 urinalysis was insupportable and could not be used as justification for any administrative action or punishment. In reaching this conclusion, the ABCMR relied on the Review Team's findings indicating that in plaintiff's case either the scientific test procedures and/or the supporting chain of custody documents were significantly deficient to render the 1983 urinalysis unreliable. The Review Team recommended that plaintiff be restored all rights, privileges, and property stemming from plaintiff's 1983 nonjudicial punishment and that the bar to reenlistment be voided and removed from his military records. The Review Team did not examine plaintiff's 1984 urinalysis results, as they fell outside the authorized period of review.

The ABCMR noted that plaintiff's reduction in grade from E5 to E1 by his commanding officer was unwarranted because the commander only had the authority to reduce him by one grade, *i.e.*, to Specialist Fourth Class (E4). Accordingly, the ABCMR recommended setting aside that portion of the October 1984 nonjudicial punishment that provided for a reduction below the pay grade of E4. The ABCMR, however, did not recommend that plaintiff return to active duty. After examining plaintiff's overall military record, it deter-

mined that the record sufficiently justified a General Discharge for misconduct due to abuse of illegal drugs. The ABCMR noted that the 1984 urinalysis was entitled to a presumption of regularity and that plaintiff adduced no proof to rebut that presumption. The board therefore concluded that the adverse actions resulting from the 1984 urinalysis, including a portion of the October 1984 nonjudicial punishment, should stand and that the evidence of drug abuse in 1984 provided sufficient evidence to justify a General Discharge. The ABCMR found that "[t]he type of discharge directed, and the reasons therefor, were appropriate, considering all the facts of the case." On May 12, 1986, the Secretary of the Army's designee approved the board's findings and recommendations. Plaintiff's military record was revised and corrected accordingly, and he was notified of the Army's action.

On September 29, 1987, plaintiff again applied to the ABCMR. On this occasion he requested that his General Discharge be set aside and that he be reinstated at the rank of Sergeant E5 and awarded all back-pay and allowances. Alternatively, plaintiff requested that the Army upgrade his discharge to Honorable.

Plaintiff challenged the accuracy of his urinalysis testing. Plaintiff contended that he did not use drugs between May 4, 1983, and September 7, 1984. The positive test results in August 1984 were erroneous, he claimed, because he tested positive for drug use on August 21, 1984, 15 days before the negative test on September 7, 1984. "This is especially so considering the long-term retention of THC in the body following the use of marijuana," he reasoned. According to plaintiff, the results were contrary to AR 600–85b(1) since "Commander-directed" urinalysis testing cannot be used for the purpose of discharging personnel and characterizing a discharge as General, rather than Honorable. Finally, plaintiff argued that the urine samples were collected in violation of his fourth amendment right against illegal search and seizure because he was repeatedly "targeted" by his commanders to

provide specimens. In support of his contentions, plaintiff provided the ABCMR with copies of the results of five urinalysis tests administered between October 6, 1983, and September 7, 1984. (Although plaintiff recalled being subjected to "Commander-directed" testing at least ten times during the period from May 4, 1983, to 21 August 1984, he only provided documentation for five.)

On July 3, 1989, the ABCMR deemed plaintiff's application as a request for reconsideration of its earlier refusal to return him to active duty status and refused to reopen the case. The ABCMR responded that since plaintiff had submitted no new material or relevant evidence, he was not entitled to have his case reexamined. The ABCMR reasoned:

In response to Mr. Henson's arguments that a negative urinalysis 15 days after a positive urinalysis shows that the positive was in error, please be advised that a positive urinalysis of a specimen indicates only that on the particular day the specimen was provided, the individual concerned had drugs in his system of a quantity equal to or in excess of the established Department of Defense standard. It is well known that drugs flush through the system over time. Therefore, specimens provided days later could show negative, and all it would mean is that the reading had slipped below the established standard. Such a subsequent reading would not invalidate a previous positive result. [Not at issue in this lawsuit.]

With regard to his remaining arguments which essentially allege that the Army violated its own regulations when it discharged him, specifically Army Regulation 600–85, I have analyzed the points he made and reviewed the regulation. I found no violation of the regula-

tion and therefore conclude that these arguments are without merit.

There is no evidence plaintiff was singled out by his commander to provide frequent urine specimens. The documents he sent to support his request show several others of his unit were tested each time he was tested. There is no evidence that any of the tests were for any reason other than a military inspection.[3]

Plaintiff filed suit in the Claims Court on August 7, 1990, asserting that his commanders targeted him for drug testing, thereby violating AR 600–85b(1) by exposing plaintiff to the unfettered discretion of his commanders in their determination of the frequency with which plaintiff would be ordered to take urine tests and their use of the test results to characterize his discharge. According to plaintiff, the tests constituted searches that failed to meet the reasonableness requirements of the fourth amendment to the U.S. Constitution. Over plaintiff's opposition, the court granted defendant's motion to suspend proceedings to allow the ABCMR to reopen the administrative proceedings, since his challenges to the number and frequency of tests and his commanders' actions "were not fleshed out by full ABCMR consideration." Def's Br. filed Jan. 15, 1991, at 3; see supra note 3. The ABCMR rendered its decision on April 18, 1991, again denying plaintiff's request for reconsideration of its denial of his application. It was determined that the information and contentions submitted did not warrant a reversal of the board's earlier decision. The ABCMR included as its reasoning a Memorandum of Consideration dated April 17, 1991, that made 13 separate findings and conclusions, eleven of which are pertinent to this action:

(1) Plaintiff presented no evidence that the urinalysis submitted on August 21, 1984 was either legally insufficient or

---

3. The records submitted with plaintiff's second application disclosed that at least eleven other soldiers were required to submit specimens for urinalysis testing on each occasion that plaintiff was required to do so. Plaintiff had two commanders during the timeframe in which he allegedly was targeted. Under one commander he provided three specimens and under the other, two specimens. The August 1984 specimen was the first provided to his new commander. Plaintiff's evaluation reports also corroborate that he served under two company commanders during the relevant period.

scientifically insupportable. Therefore, the Board again concluded that the urinalysis was entitled to the presumption of regularity. [Not at issue in this lawsuit.]

(2) Plaintiff's contention that he was singled out by his commander to provide frequent and an unreasonable number of specimens was not supported by the records nor the documents he submitted.

(3) Although plaintiff alleged he provided 10 specimens during the period in question, he submitted evidence of only five. Five specimens during an 11-month period were deemed reasonable in frequency and number. [The board analyzed records showing dates and test results (positive or negative) for five tests in which plaintiff participated and three tests for which plaintiff did not provide a specimen. (October 11, 1983; January 11, 1984; and January 25, 1984).]

(4) The Board noted that during the period in question he served under two different commanders; that under one commander he provided three specimens and under the other he provided two. To be convinced by his argument that he was singled out, the Board indicated that it would have to believe that he was unfairly targeted by both commanders and further would have to discount the fact that other soldiers were tested each time he was tested. The Board would also have to disregard the fact that there were times when members of his unit were required to provide specimens and he was not similarly required.

(5) The Board noted that there existed an* interval of seven months between two of his specimens, during which 159 specimens were collected. Moreover, a change of command occurred during this time and six months passed before his second commander requested that plaintiff provide a urine specimen (the contested one in 1984).

(6) A negative urinalysis test obtained 15 days after a positive urinalysis proved nothing but the fact that on the date of the second urinalysis, plaintiff had no drugs in his system of a quantity equal to or in excess of the established Department of Defense standard. The Board noted that "it is well known that drugs flush through the system over a period of time." [Not at issue in this lawsuit.]

(7) It appeared to the Board from the available records that the specimen provided by plaintiff on August 21, 1984 was provided as part of an inspection properly conducted in accordance with the applicable regulation and not for the purpose of determining his fitness for duty, as plaintiff alleged.

(8) There was no evidence that the inspection was directed immediately following a report of a specific offense in the unit; the available evidence did not conclusively show that specific individuals had been selected to provide specimens; and no allegation had been made that persons examined were subjected to substantially different intrusions during the same urinalysis. These things, at a minimum, needed to be shown in order to prove that the inspection was anything other than what it was purported to be.

(9) The Board maintained that the commander was not required to have a reasonable suspicion that the applicant was using drugs in order to direct a health and welfare inspection of a part of his unit. Therefore, since the applicant had not shown that he was singled out, or that it was a "fitness for duty" urinalysis, the urinalysis obtained on August 21, 1984 was not protected by the Army's limited use policy.

(10) Plaintiff's administrative separation was accomplished in compliance with applicable regulations with no indication of procedural error which would tend to jeopardize his rights. The type of discharge directed and the reason therefore were deemed appropriate.

(11) Under Army Regulation 635–200, rehabilitative transfer was not required when discharge was contemplated for drug abuse. [The board reasoned: "The above-cited regulation also provides that abuse of illegal drugs is serious misconduct and separation action normally will be based upon commission of a serious offense" (paragraph 14–12c). Further,

the regulation stipulates that first time drug offenders in grades E–5 through E–9 "must" be processed for separation after a second offense; and other personnel "(first time offenders in grades E–1—E–4) may be processed for separation as appropriate." Normally, a discharge under other than honorable conditions is issued.]

(12) Again, the Board concluded that the positive urinalysis of August 21, 1984, and the resultant nonjudicial punishment were sufficient to justify plaintiff's discharge as originally approved.

(13) In view of the preceding observations, the Board felt that there was no basis for granting plaintiff's requests.

## DISCUSSION

■ In military pay matters, the court reviews a plaintiff's case "through the prism of a correction board." *Cohn v. United States,* 15 Cl.Ct. 778, 789 (1988). The court's review is limited. In order to overturn the Board's decision the plaintiff must show (1) a material legal error or injustice in the correction board proceeding and (2) an adequate nexus between the error or injustice and his separation from service without disability compensation. *Hary v. United States,* 223 Ct.Cl. 10, 15, 618 F.2d 704, 706 (1980). Further, plaintiff must overcome the presumption that "administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Sanders v. United States,* 219 Ct.Cl. 285, 302, 594 F.2d 804, 813 (1979). While the court might disagree with the ABCMR's decision, it cannot substitute its own judgment for the board's if reasonable minds could reach differing resolutions of a disputed fact.

The ABCMR concluded that plaintiff had failed to show that "the inspection was anything other than an inspection." Plaintiff asserts that because he was tested on so many occasions subsequent to testing positive on May 4, 1983, for the presence of tetrahydrocannabinol, the psychoactive ingredient found in marijuana, the tests were not inspections, but were conducted for the purpose of obtaining evidence for use in a disciplinary proceeding. Defendant rejoins that the tests were Commander-directed tests pursuant to AR 600–85b(1), duly conducted as inspections consistent with MRE 313 for the purpose of preserving the health of servicemembers. Under MRE 313, an inspection is defined, as follows:

(b) Inspections. An "inspection" is an examination of the whole or part of a unit, ... conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit.... An inspection may include but is not limited to an examination to determine and to ensure that any or all of the following requirements are met: ... and that personnel are present, fit, and ready for duty.... An order to produce body fluids, such as urine, is permissible in accordance with this rule. *An examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection within the meaning of this rule....* Inspections shall be conducted in a reasonable fashion and shall comply with Mil.R.Evid. 312, if applicable....

(Emphasis added.) The Editorial Comment to MRE 313(b), states: "Presumably, the only limitation on urinalysis under the court's [*Murray v. Haldeman,* 16 M.J. 74 (CMA 1983)] reasoning, is that the procedure must be reasonable and that the *servicemember must not be singled out in any way....*" (Emphasis added.)

Plaintiff argues that he was "singled out" to provide an unreasonable number of "Commander-directed" urinalysis tests. Moreover, according to plaintiff, because he was singled out, the criteria for military inspections no longer applied and, therefore, the Army's actions violated plaintiff's fourth amendment right to be free of unreasonable searches and seizures.

In support of his contention that he was "singled out for disciplinary proceedings" subsequent to his testing positive for the use of illegal drugs in May 1983, plaintiff provided the ABCMR with copies of his unit's urinalysis ledgers—FC Forms 968

(Urine Collection Control Ledger) and DA Forms 5180–R (Urinalysis Custody and Report Record). The documents indicate that on October 6, 1983, 12 urine specimens were obtained from plaintiff's unit. His, among them, was reported negative. On October 11, 1983, five specimens were provided. His "was not among them." On January 5, 1984, another 12 specimens were provided. Plaintiff's test, among them, was negative. On January 11, 1984, 12 specimens were provided. Plaintiff "did not provide a specimen." On January 20, 1984, 12 specimens were provided. Plaintiff's test was negative. On January 25, 1984, 12 specimens were provided. Plaintiff "did not provide a specimen." On August 21, 1984, 12 specimens, including plaintiff's were provided, that tested positive. Finally, on September 7, 1984, 12 specimens were provided, including plaintiff's, that tested negative. Plaintiff was tested on five occasions, for three of which he did not provide a specimen or his specimen "was not among" those tested.[4] It appears that the five actual reported test results may have come from an on-site evaluation and may not include every specimen provided.

To substantiate his claim that he had been tested on more than five occasions within the eleven-month period, plaintiff submitted to the court the affidavit of Leon H. Bonner, who is a former Health Aide with the U.S. Army and Community counseling Services Division, Urinalysis Section, Fort Campbell, Kentucky. Mr. Bonner stated that plaintiff

> would give a urine specimen at my office if he missed a unit urinalysis test for any reason or when he was tested using the Emit Portable Test Kit.[5] On those occasions the entry would not be recorded on his unit ledger[;] it would have been recorded on one of my ledgers.

Affidavit of Leon H. Bonner, Sept. 27, 1991, ¶ 4. Mr. Bonner explained that he kept two ledgers, one for positive test re-

sults and the other for negative test results. In response to plaintiff's Freedom of Information Act ("FOIA") request, Mr. Bonner provided plaintiff with only positive test results because he was not instructed to search for negative results. According to Mr. Bonner, plaintiff's negative test results on specimens given at Mr. Bonner's office were destroyed after two years. Plaintiff contends that additional records of the five, or more, test results not reported through the FOIA request are beyond his control and if available would substantiate that he was targeted for an unreasonable number of urine tests.

Plaintiff also submitted in this court proceeding the affidavit of Cosme A. Davila, who has been employed since April 1985 as the Chief of Identification and Training Branch, Directorate of Personnel and Community Activities, Community Counseling Services Division, Fort Campbell, Kentucky. Mr. Davila's job is to supervise the Urinalysis Prescreening Facility, Urinalysis Collection Branch, and the Education Branch and Data Management. Mr. Davila states that in his opinion "Mr. Henson's numerous tests were unusual because the only soldiers who were regularly tested during this timeframe [ (October 6, 1983, to September 7, 1984) ] were soldiers in the drug rehabilitation program or soldiers who were given command directed tests to ascertain their fitness for duty or for referral to the Drug Rehabilitation Program." Affidavit of Cosme A. Davila, Sept. 27, 1991, ¶ 4. Mr. Davila further states that he "checked the Community Counseling Services records and verified that Anthony Henson was not assigned to the drug rehabilitation program." *Id.*

Defendant responds that the ABCMR correctly determined that plaintiff was not singled out by his commanders because plaintiff had two commanders during the relevant timeframe and there were approximately 160 samples taken from other soldiers in plaintiff's unit during the six-

---

4. No explanation has been offered by defendant to explain what is meant by "he did not provide a specimen." This statement must be contrasted with "his was not among them."

5. Plaintiff claimed before the ABCMR that he had been tested using the Emit Portable Test Kit.

month period between plaintiff's third urinalysis on January 20, 1984, and his fourth urinalysis on August 21, 1984. During the month of January, there were approximately four urinalysis tests conducted in plaintiff's unit of over 125 soldiers. At each testing, 12 soldiers were required to provide specimens. Therefore, defendant argues, plaintiff was not singled out. This assumption is inconclusive with respect to the reasonableness of the testing. The ABCMR did not adequately probe into the frequency of the testing in relation to the two, or more, instances where plaintiff was called to provide a specimen and was absent from his unit.

 Defendant's response to Messrs. Bonner's and Davila's affidavits is that plaintiff's failure to provide the ABCMR with this evidence constitutes a waiver of the right to present it and precludes the Claims Court from considering the evidence. In *Doyle v. United States*, 220 Ct.Cl. 285, 311, 599 F.2d 984, 1000 (1979), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 837 (1980), the Court of Claims explained that "[i]t has long been part of our law that a party cannot raise an issue on appeal to a court when it failed to raise it before an administrative agency competent to hear it." (Citation omitted.) *Doyle* held that if a plaintiff is aware of a problem with a correction board's ruling, he is required to voice his objections in a way that the Secretary or correction board is aware of the problem, and if not, the issue is waived. 220 Ct.Cl. at 312, 599 F.2d at 1001. Plaintiff has not failed to raise an issue to the ABCMR that he is now bringing before the court. Contrary to defendant's reading of *Doyle*, the rule precludes new issues and not issues effectively raised below, but not fully developed due to reasons beyond plaintiff's control. For example, in *Wales v. United States*, 14 Cl.Ct. 580, 593, *aff'd*, 865 F.2d 268 (Fed.Cir.1988) (Table), this court refused to consider affidavits from allegedly percipient witnesses absent any reason why the serviceman

could not have presented them to the correction board four years earlier.

In *Maier v. Orr*, 754 F.2d 973 (Fed.Cir. 1985), the servicemember was discharged in 1977 for disability due to her inability to tolerate smallpox vaccine. In 1980 she submitted an application to the correction board with letters from doctors stating that as of 1980 plaintiff could tolerate small doses of the smallpox vaccine. 754 F.2d at 976. The board was not persuaded by plaintiff's evidence because it found that the disability decision was based on the best medical evidence available at the time (1977). The Federal Circuit agreed, ruling that if more evidence was available in 1977, plaintiff waived her right to present it to the disability board. *Id.* at 983 n. 9. In the instant case, the evidence submitted to the Claims Court was the product of plaintiff's going behind the responses to his FOIA request to query more specifically Army employees about their knowledge. In these circumstances plaintiff should not be bound to the information provided pursuant to the FOIA request.

 It is defendant's theory that records of negative test results were not provided through plaintiff's FOIA request because they were destroyed. There is no basis for this assumption. Mr. Bonner did not state that any of the records were unavailable when the FOIA request was made. In fact, Mr. Bonner explained that he only provided the positive results because he was not instructed to do more. While it is true that plaintiff bears the burden of presenting sufficient evidence to the ABCMR to establish his claim,[6] at the time plaintiff presented his claim to the ABCMR, he had no way of knowing that the Army had not assured him access to all official documents that were germane to his query. Therefore, if subsequent to the correction board proceeding, plaintiff discovered that he was not given all records necessary to an adequate presentation of

---

6. Plaintiff claimed before the ABCMR that he was tested on more than five occasions. In addition, plaintiff's unit urinalysis record provided to the board showed that on at least two occasions "he did not provide a specimen." On those two occasions plaintiff may have been "selected" for testing.

his case,[7] he should not be penalized for coming forth with this evidence in court as long as this evidence pertains to an issue that was presented to the board.

Defendant concedes that the affidavits of Messrs. Bonner and Davila allege facts that appear to be probative on the issues of frequency of testing and of plaintiff's being singled out for testing. In this case plaintiff relies on affidavits from one current Army employee and a former Army employee to explain the absence of records solely within the Army's control. This evidence is germane to facts that the ABCMR found to deny plaintiff's application, specifically finding No. 3 that "5 specimens during an 11–month period were deemed reasonable in frequency and number" and findings Nos. 2 and 12 to the effect that plaintiff was not singled out for testing. Mr. Bonner, the custodian of records, avers that plaintiff was tested on more than the five occasions, since Mr. Bonner recalls testing plaintiff on other occasions with the E-mit Portable Test Kit. These circumstances justify allowing the new evidence to be submitted for the first time on review of the ABCMR's decision.

## CONCLUSION

The court considers that the ABCMR should evaluate plaintiff's evidence in addressing the question whether the number of drug tests as found by the board may be inaccurate. The board also should consider the impact of an increase in the number of tests on its prior findings, given the Army's presumption that inspections are not to be deemed searches only in limited circumstances. The parties submitted a joint list of questions that the ABCMR should address on remand:

1. Determine how many soldiers were serving in plaintiff's unit on May 3–4, 1983; October 6, 1983; January 5 and 20, 1984; August 21, 1984; and September 7, 1984. Determine of that number how many soldiers were eligible for selection on those dates to undergo urinalysis testing.

2. Determine, if possible, what method was used to select which soldiers in plaintiff's military unit would undergo urinalysis testing on May 3–4, 1983; October 6, 1983; January 5, 1984; January 20, 1984; August 21, 1984; and September 7, 1984. If necessary the ABCMR should attempt to contact plaintiff's unit commanders, unit executive officers, NCOIC's, unit drug testing monitors, or any other person potentially having this information.

3. In addition to the tests which plaintiff previously submitted to the ABCMR, determine if any Army records now exist which establish that plaintiff or any other soldier in his unit underwent any additional urinalysis tests from May 3, 1983, through September 7, 1984. Based upon any such information, the ABCMR should determine which, if any, other soldiers in plaintiff's unit were tested as frequently, or more frequently, than plaintiff during that same period of time. State the soldier's(s') name(s) and rank and provide copies of the supporting documentation.

4. Determine whether Army records reveal that plaintiff underwent any E-mit testing during the same period of time. Describe E-mit testing, and determine why such testing was conducted. If that information is not available, the ABCMR should determine the possible reasons for which plaintiff might have been required to undergo E-mit testing.

5. If any testing documentation for plaintiff's unit during the pertinent time period is no longer contained in the Army's records, the ABCMR should determine why these records no longer exist.

6. Based upon its review of the evidence of record, the ABCMR should determine whether plaintiff was singled out for testing and the basis for its conclusion. If the ABCMR determines that plaintiff was singled out for testing, the ABCMR should

---

7. 32 C.F.R. § 581.2(5)(i) provides in full:
 (5) **Access to records.** (i) The applicant will be assured access to all official records that are necessary to an adequate presentation of his case consistent with regulations governing privileged or classified material. It is the responsibility of the applicant to procure such evidence not contained in the official records of the Department of the Army as he desires to present in support of his case.

further determine whether plaintiff is entitled to any relief and state the basis for its conclusion.

7. Regardless of the number of currently existing test results, the ABCMR should determine whether, if plaintiff was tested seven times during that period, the ABCMR considers that it is more likely than not that his commanders singled him out for testing and, if so, whether plaintiff is entitled to any relief. If plaintiff was tested 10 times during that period, state whether the ABCMR considers it more likely than not that his commanders likely singled plaintiff out for testing and, if so, whether plaintiff is entitled to any relief. The ABCMR shall state the bases for its conclusions.

Accordingly, based on the foregoing,

IT IS ORDERED, as follows:

1. Pursuant to RUSCC 60.1(a)(1), this case is remanded to the Army Board for the Correction of Military Records (the "ABCMR").

2. The ABCMR will thoroughly review the available evidence to determine the matters set forth above. In furtherance of this mandate, the ABCMR shall conduct such further proceedings if and as the ABCMR deems proper. The court deems that the record would benefit if the ABCMR communicated with Messrs. Davila and Bonner to obtain any pertinent information from these individuals.

3. Defendant's motion for summary judgment is denied without prejudice to renewal if the case is not disposed of before the ABCMR.

4. Proceedings in this court are stayed until May 1, 1992, by which time the ABCMR shall issue and transmit its decision to the Clerk of the Court pursuant to RUSCC 60.1(b)(3).

5. Any notice pursuant to RUSCC 60.1(b)(4) shall be filed by June 1, 1992, and further proceedings will be scheduled promptly.