**Anthony L. HENSON, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 90–737C.**

United States Court of Federal Claims.

Jan. 29, 1993.

Mark J. Ivandick, Clarksville, TN, for plaintiff.

1. The recital of facts in the earlier opinion is reproduced herein, as well as pertinent portions of the discussion.

2. Review of a decision by a military correction board is confined to the record. *See Long v. United States,* 12 Cl.Ct. 174 (1987) (order denying discovery request). The review is undertaken through cross-motions for summary judgment. RCFC 56.1.

James M. Kinsella, Washington, DC, with whom was Assistant Attorney General Stuart M. Gerson, for defendant. Major Jill M. Grant, Office of the Judge Advocate General, United States Army, of counsel.

## OPINION

NETTESHEIM, Judge.

■ In a December 23, 1991 opinion, the court remanded this matter for investigation and factfinding by the Army Board for Correction of Military Records (the "ABCMR" or the "Board"). *Henson v. United States,* 24 Cl.Ct. 786 (1991).[1] The ABCMR issued its decision again denying plaintiff relief on June 24, 1992. This case is now before the court after argument on renewed cross-motions for summary judgment.[2] At issue is whether the military impermissibly singled out plaintiff for drug testing.

## FACTS

The following facts derive from the administrative record and are undisputed. Anthony L. Henson ("plaintiff") enlisted in the United States Army (the "Army") on February 7, 1980, serving on active duty until December 3, 1984, when he was separated pursuant to Army Regulation ("AR") 635–200 ¶ 14–12c, d(1) (Oct. 15, 1984), for a first-time drug offense. Plaintiff's separation occurred prior to August 12, 1985, his scheduled date of separation. He was issued a General Discharge pursuant to AR 635–200 ¶ 3–7b(1).[3]

From May 4, 1983, to September 7, 1984, several urinalysis specimens were collected from plaintiff pursuant to AR 600–85b(1) (Feb. 11, 1983), providing for "Commander-directed" tests. These tests are ordered (a) when the commander has a reasonable suspicion that a soldier is using a controlled

3. AR 635–200 ¶ 3–7b(1) provides in full: "A general discharge is a separation from the Army under honorable conditions. When authorized, it is issued to a member whose military record is satisfactory but not sufficiently meritorious to warrant an honorable discharge."

substance, (b) as part of a search and seizure under the Military Rules of Evidence ("MRE"), or (c) as part of a unit inspection. AR 600–85b(1) provides, in pertinent part:

Commanders may direct individual servicemembers, part of units, or entire units to submit to urine testing in one or more of the ways listed below. The decision to test is a command judgment. Urine tests will be conducted at the unit, or elsewhere the commander directs....

(a) When there is reasonable suspicion a member is using a controlled substance:

1. A urine test for the valid medical purpose of determining the member's fitness for duty....

2. A urine test to ascertain whether a member requires counseling, treatment, or rehabilitation for drug abuse....

(b) A urine test as a search or seizure under Military Rules of Evidence 312, 314, 315 and 316.

(c) A urine test as part of the unit, or entire unit, as an inspection under Military Rules of Evidence 313 for the purpose of preserving the health of the servicemembers inspected (Military Rule of Evidence 312(f)), or for any other inspection purpose.

The Army recorded plaintiff's tests, as follows:

| Date | Positive | Negative | Untested | None Provided |
|---|---|---|---|---|
| May 4, 1983 | X | | | |
| Oct. 6, 1983 | | X | | |
| Oct. 11, 1983 | | | X | |
| Jan. 5, 1984 | | X | | |
| Jan. 11, 1984 | | | | X |
| Jan. 20, 1984 | | X | | |
| Jan. 25, 1984 | | | | X |
| Aug. 21, 1984 | X | | | |
| Sept. 7, 1984 | | X | | |

Based on the results of the May 4, 1983 urinalysis, plaintiff was offered and accepted nonjudicial punishment. Additionally, the Army barred him from seeking reenlistment on February 29, 1984. After the August 21, 1984 urinalysis, plaintiff was once again offered and subjected to nonjudicial punishment for illicit use of marijuana. His punishment included a demotion of grade from E5 (Sergeant) to E1 (Private First Class). Plaintiff did not appeal either action taken against him.

On November 19, 1984, Captain Kyle L. Edmonds notified plaintiff that he recommended initiating separation proceedings against plaintiff, citing as evidence the results of his urinalysis tests. Colonel James R. Harding approved the recommendation on November 26, 1984, and directed that a General Discharge Certificate be issued to plaintiff. Ultimately, plaintiff received a General Discharge on December 3, 1984.

Concerned about the accuracy of its toxicology and drug testing program, the Army convened a "Blue Ribbon" Panel in 1983 to review the administrative and scientific procedures then in use by Army laboratories. Although the Panel determined that the testing procedures were sufficient to meet the objective of identifying substance abuse with tolerable accuracy, it also concluded that a percentage of previously reported positive urinalysis results could not be used to support disciplinary or administrative action.

Accordingly, the Army Deputy Chief of Staff for Personnel assembled a Urinalysis Records Review Team to examine urinalysis results obtained between April 27, 1982, to October 31, 1983. All persons who had tested positive within that timeframe, including plaintiff, were notified that they now had a right to apply to the ABCMR.

On or about July 15, 1985, plaintiff availed himself of this opportunity and filed an application, seeking correction of his military records to reflect reinstatement and requesting that all references to his 1983 urinalysis, including his nonjudicial punishment, be eradicated from his records. Plaintiff's reasoning for this latter request was based on the Panel's finding that the results of his 1983 urinalysis could not be used scientifically to support disciplinary action against him due to imprecise and inadequate testing or deficiencies in the supporting chain of custody documents. He did not challenge his 1984 urinalysis in this application to the ABCMR.

On or about April 23, 1986, the ABCMR ruled that the 1983 urinalysis was insupportable and could not be used as justification for any administrative action or punishment. In reaching this conclusion, the ABCMR relied on the Review Team's findings indicating that in plaintiff's case either the scientific test procedures and/or the supporting chain of custody documents were significantly deficient to render the 1983 urinalysis unreliable. The Review Team recommended that plaintiff be restored all rights, privileges, and property stemming from plaintiff's 1983 nonjudicial punishment and that the bar to reenlistment be voided and removed from his military records. The Review Team did not examine plaintiff's 1984 urinalysis results, as they fell outside the authorized period of review.

The ABCMR noted that plaintiff's reduction in grade from E5 to E1 by his commanding officer was unwarranted because the commander only had the authority to reduce him by one grade, i.e., to Specialist Fourth Class (E4). Accordingly, the ABCMR recommended setting aside that portion of the October 1984 nonjudicial punishment that provided for a reduction below the pay grade of E4. The ABCMR, however, did not recommend that plaintiff return to active duty. After examining plaintiff's overall military record, it determined that the record sufficiently justified a General Discharge for misconduct due to abuse of illegal drugs. The ABCMR noted that the 1984 urinalysis was entitled to a presumption of regularity and that plaintiff adduced no proof to rebut that presumption. The Board therefore concluded that the adverse actions resulting from the 1984 urinalysis, including a portion of the October 1984 nonjudicial punishment, should stand and that the evidence of drug abuse in 1984 provided sufficient evidence to justify a General Discharge. The ABCMR found that "[t]he type of discharge directed, and the reasons therefor, were appropriate, considering all the facts of the case." On May 12, 1986, the Secretary of the Army's designee approved the Board's findings and recommendations. Plaintiff's military record was revised and corrected accordingly, and he was notified of the Army's action.

Plaintiff submitted a request under the Freedom of Information Act (the "FOIA") that was received on June 18, 1986, by Ms. Jo Ann Wyatt, FOIA Officer at Fort Campbell. Plaintiff requested sanitized copies of the unit's urine collection ledgers. However, Ms. Wyatt, in a letter dated June 27, 1986, denied plaintiff's request for sanitized copies. The Army did provide plaintiff with some documentary evidence from the unit files, but not, according to plaintiff, from the division drug files. Plaintiff now suggests that evidence within defendant's control may have been destroyed after plaintiff filed his FOIA request, i.e., sanitized copies of the unit's urine collection ledgers and records of any additional drug tests administered to plaintiff contained in negative ledgers, which would have supported plaintiff's assertions that the drug testing process was not random. See discussion of Affidavit of Leon H. Bonner, infra p. 587.

On September 29, 1987, plaintiff again applied to the ABCMR. On this occasion he requested that his General Discharge be set aside and that he be reinstated at the rank of Sergeant E5 and awarded all backpay and allowances. Alternatively, plaintiff requested that the Army upgrade his discharge to Honorable.

Plaintiff challenged the accuracy of his urinalysis testing. Plaintiff contended that he did not use drugs between May 4, 1983,

and September 7, 1984. The positive test results in August 1984 were erroneous, he claimed, because he tested positive for drug use on August 21, 1984, 15 days before the negative test on September 7, 1984. "This is especially so considering the long-term retention of THC in the body following the use of marijuana," he reasoned. According to plaintiff, the results were contrary to AR 600–85b(1) since "Commander-directed" urinalysis testing cannot be used for the purpose of discharging personnel and characterizing a discharge as General, rather than Honorable. Finally, plaintiff argued that the urine samples were collected in violation of his fourth amendment right against illegal search and seizure because he was repeatedly "targeted" by his commanders to provide specimens. In support of his contentions, plaintiff provided the ABCMR with copies of the results of five urinalysis tests administered between October 6, 1983, and September 7, 1984. (Although plaintiff recalled being subjected to "Commander-directed" testing at least ten times during the period from May 4, 1983, to 21 August 1984, he only provided documentation for five after the May 4, 1983 test.)

In support of his contention that he was "singled out for disciplinary proceedings" subsequent to his testing positive for the use of illegal drugs in May 1983, plaintiff provided the ABCMR, as part of the 1987 application, with copies of his unit's urinalysis ledgers—FC Forms 968 (Urine Collection Control Ledger) and DA Forms 5180–R (Urinalysis Custody and Report Record). The documents indicate that on October 6, 1983, 12 urine specimens were obtained from plaintiff's unit. His, among them, was reported negative. On October 11, 1983, five specimens were provided. His "was not among them." On January 5, 1984, another 12 specimens were provided.

Plaintiff's test, among them, was negative. On January 11, 1984, 12 specimens were provided. Plaintiff "did not provide a specimen." On January 20, 1984, 12 specimens were provided. Plaintiff's test was negative. On January 25, 1984, 12 specimens were provided. Plaintiff "did not provide a specimen." On August 21, 1984, 12 specimens, including plaintiff's were provided, that tested positive. Finally, on September 7, 1984, 12 specimens were provided, including plaintiff's, that tested negative. Plaintiff was tested on five occasions, for three of which he did not provide a specimen or his specimen "was not among" those tested.[4]

On July 3, 1989, the ABCMR deemed plaintiff's application as a request for reconsideration of its earlier refusal to return him to active duty status and refused to reopen the case. The ABCMR responded that since plaintiff had submitted no new material or relevant evidence, he was not entitled to have his case reexamined. The reasoning adopted by the ABCMR in respect of those charges that are included in his lawsuit follows:

> With regard to his remaining arguments which essentially allege that the Army violated its own regulations when it discharged him, specifically Army Regulation 600–85, I have analyzed the points he made and reviewed the regulation. I found no violation of the regulation and therefore conclude that these arguments are without merit.
>
> There is no evidence plaintiff was singled out by his commander to provide frequent urine specimens. The documents he sent to support his request show several others of his unit were tested each time he was tested. There is no evidence that any of the tests were for any reason other than a military inspection.[5]

4. No explanation has been offered by defendant to explain what is meant by "he did not provide a specimen." This statement must be contrasted with "his was not among them."

5. The records submitted with plaintiff's second application disclosed that at least eleven other soldiers were required to submit specimens for urinalysis testing on each occasion that plaintiff was required to do so. Plaintiff had two commanders during the timeframe beginning in October 1983 in which he allegedly was targeted. Under one commander, he provided three specimens and under the other, two specimens. The August 1984 specimen was the first provided to his new commander. Plaintiff's evaluation reports also corroborate that he served under two

Plaintiff filed suit in the Claims Court on August 7, 1990, asserting that his commanders targeted him for drug testing, thereby violating AR 600–85b(1) by exposing plaintiff to the unfettered discretion of his commanders in their determination of the frequency with which plaintiff would be ordered to take urine tests and their use of the test results to characterize his discharge. According to plaintiff, the tests constituted searches that failed to meet the reasonableness requirements of the fourth amendment to the U.S. Constitution. Over plaintiff's opposition, the court granted defendant's motion to suspend proceedings to allow the ABCMR to reopen the administrative proceedings, since his challenges to the number and frequency of tests and his commanders' actions "were not fleshed out by full ABCMR consideration." Def's Br. filed Jan. 15, 1991, at 3; *see supra* note 4. The ABCMR rendered its decision on April 18, 1991, again denying plaintiff's request for reconsideration of its denial of his application. It was determined that the information submitted and plaintiff's arguments did not warrant a reversal of the Board's earlier decision. The ABCMR included as its reasoning a Memorandum of Consideration dated April 17, 1991, that made 13 separate findings and conclusions, eleven of which, quoted below, are pertinent to this action:

(2) Plaintiff's contention that he was singled out by his commander to provide frequent and an unreasonable number of specimens was not supported by the records nor the documents he submitted.

(3) Although plaintiff alleged he provided 10 specimens during the period in question, he submitted evidence of only five. Five specimens during an 11–month period were deemed reasonable in frequency and number. [The Board analyzed records showing dates and test results (positive or negative) for five tests in which plaintiff participated and three tests for which plaintiff did not provide a specimen. (October 11, 1983; January 11, 1984; and January 25, 1984).]

company commanders during the relevant

(4) The Board noted that during the period in question he served under two different commanders; that under one commander he provided three specimens and under the other he provided two. To be convinced by his argument that he was singled out, the Board indicated that it would have to believe that he was unfairly targeted by both commanders and further would have to discount the fact that other soldiers were tested each time he was tested. The Board would also have to disregard the fact that there were times when members of his unit were required to provide specimens and he was not similarly required.

(5) The Board noted that there existed an interval of seven months between two of his specimens, during which 159 specimens were collected. Moreover, a change of command occurred during this time and six months passed before his second commander requested that plaintiff provide a urine specimen (the contested one in 1984).

. . . .

(7) It appeared to the Board from the available records that the specimen provided by plaintiff on August 21, 1984 was provided as part of an inspection properly conducted in accordance with the applicable regulation and not for the purpose of determining his fitness for duty, as plaintiff alleged.

(8) There was no evidence that the inspection was directed immediately following a report of a specific offense in the unit; the available evidence did not conclusively show that specific individuals had been selected to provide specimens; and no allegation had been made that persons examined were subjected to substantially different intrusions during the same urinalysis. These things, at a minimum, needed to be shown in order to prove that the inspection was anything other than what it was purported to be.

(9) The Board maintained that the commander was not required to have a reasonable suspicion that the applicant was using drugs in order to direct a health

period.

and welfare inspection of a part of his unit. Therefore, since the applicant had not shown that he was singled out, or that it was a "fitness for duty" urinalysis, the urinalysis obtained on August 21, 1984 was not protected by the Army's limited use policy.

(10) Plaintiff's administrative separation was accomplished in compliance with applicable regulations with no indication of procedural error which would tend to jeopardize his rights. The type of discharge directed and the reason therefore were deemed appropriate.

(11) Under Army Regulation 635–200, rehabilitative transfer was not required when discharge was contemplated for drug abuse. [The Board reasoned: "The above-cited regulation also provides that abuse of illegal drugs is serious misconduct and separation action normally will be based upon commission of a serious offense (¶ 14–12c). Further, the regulation stipulates that first time drug offenders in grades E–5 through E–9 "must" be processed for separation after a second offense; and other personnel "(first time offenders in grades E–1—E–4) may be processed for separation as appropriate." Normally, a discharge under other than honorable conditions is issued.]

(12) Again, the Board concluded that the positive urinalysis of August 21, 1984, and the resultant nonjudicial punishment were sufficient to justify plaintiff's discharge as originally approved.

(13) In view of the preceding observations, the Board felt that there was no basis for granting plaintiff's requests.

To substantiate his claim that he had been tested on more than five occasions within the eleven-month period from October 6, 1983, to September 7, 1984, plaintiff submitted the affidavit of Leon H. Bonner to the court in connection with the earlier cross-motions that followed the second ABCMR decision. Mr. Bonner, a former Health Aide with the U.S. Army and Community counseling Services Division, Urinalysis Section, Fort Campbell, Kentucky, stated that plaintiff

would give a urine specimen at my office if he missed a unit urinalysis test for any reason or when he was tested using the Emit Portable Test Kit.[6] On those occasions the entry would not be recorded on his unit ledger[;] it would have been recorded on one of my ledgers.

Affidavit of Leon H. Bonner, Sept. 27, 1991, ¶ 4. Mr. Bonner explained that he kept two ledgers, one for positive test results and the other for negative test results. In response to plaintiff's FOIA request, Mr. Bonner provided plaintiff with only positive test results because he was not instructed to search for negative results. According to Mr. Bonner, plaintiff's negative test results on specimens given at Mr. Bonner's office were destroyed after two years. Plaintiff contends that additional records of the five, or more, test results not recovered through his FOIA request are beyond his control and if available would substantiate that he was targeted for an unreasonable number of urine tests.

Plaintiff also submitted in the earlier court proceeding the affidavit of Cosme A. Davila, who has been employed since April 1985 as the Chief of Identification and Training Branch, Directorate of Personnel and Community Activities, Community Counseling Services Division, Fort Campbell, Kentucky. Mr. Davila's job is to supervise the Urinalysis Prescreening Facility, Urinalysis Collection Branch, and the Education Branch and Data Management. Mr. Davila states that in his opinion "Mr. Henson's numerous tests were unusual because the only soldiers who were regularly tested during this timeframe [ (October 6, 1983, to September 7, 1984) ] were soldiers in the drug rehabilitation program or soldiers who were given command directed tests to ascertain their fitness for duty or for referral to the Drug Rehabilitation Program." Affidavit of Cosme A. Davila, Sept. 27, 1991, ¶ 4. Mr. Davila further

---

6. Plaintiff claimed before the ABCMR that he had been tested using the EMIT Portable Test Kit.

states that he "checked the Community Counseling Services records and verified that Anthony Henson was not assigned to the drug rehabilitation program." *Id.* In its December 23, 1991 opinion, the court ruled that the Bonner and Davila affidavits should be considered even though they had not been submitted to the ABCMR. *Henson,* 24 Cl.Ct. at 794.

Also on December 23, 1991, after argument on cross-motions for summary judgment, the court again remanded the case for investigation and factfinding by the ABCMR. This time the court requested that the ABCMR address seven specific issues that the parties jointly had presented for inclusion in the remand order and evaluate plaintiff's evidence in determining whether the number of drug tests as found by the Board may be inaccurate. The court specifically stated that the record would benefit if the ABCMR communicated with Messrs. Davila and Bonner to obtain any pertinent information from these individuals. *Henson,* 24 Cl.Ct. at 796. The court also requested that the ABCMR determine whether a finding that the number of tests was higher than previously known would cause a change in its previous decision. The ABCMR issued a decision on June 24, 1992, again denying plaintiff's claims.

In addressing the seven specific issues, the ABCMR employed the investigative services of the Inspector General ("IG") at Fort Campbell, Kentucky, for assistance with the first five issues (1–5). The Judge Advocate General (the "JAG") assisted the ABCMR with the last two issues. The court's seven questions and the ABCMR's findings are summarized below:

1. Determine how many soldiers were serving in plaintiff's unit on May 3–4, 1983; October 6, 1983; January 5 and 20, 1984; August 21, 1984; and September 7, 1984. Determine of that number how many soldiers were eligible for selection on those dates to undergo urinalysis testing.

ABCMR: "The IG determined that the number of soldiers could only be approximated since records are no longer available. However, previous leaders of the unit remember it was at about 85 percent strength, indicating 115 to 120 personnel. No information could be found from which to determine the number of individuals available for testing."

2. Determine, if possible, what method was used to select which soldiers in plaintiff's military unit would undergo urinalysis testing on May 3–4, 1983; October 6, 1983; January 5, 1984; January 20, 1984; August 21, 1984; and September 7, 1984. If necessary the ABCMR should attempt to contact plaintiff's unit commanders, unit executive officers, NCOIC's, unit drug testing monitors, or any other person potentially having this information.

ABCMR: "The IG was unable to determine the exact method by which soldiers of the applicant's unit were selected for drug testing. However, its conversations with former supervisors of the command revealed that during the period in question (3 May 1983 through 7 September 1984) each unit to be tested would be sent a number from one to ten. All soldiers with a social security number ending in that number would then report to the battalion for supervised urinalyses." The ABCMR concluded that "all of the statements from available superiors of [plaintiff's] former command indicate that soldiers were selected for drug testing on a random basis and that the procedures were very strict."

3. In addition to the tests which plaintiff previously submitted to the ABCMR, determine if any Army records now exist which establish that plaintiff or any other soldier in his unit underwent any additional urinalysis tests from May 3, 1983, through September 7, 1984. Based upon any such information, the ABCMR should determine which, if any, other soldiers in plaintiff's unit were tested as frequently, or more frequently, than plaintiff during that same period of time. State the soldier's(s') name(s) and rank and provide copies of the supporting documentation.

ABCMR: "The IG found that Fort Campbell has no records of positive urinalysis tests performed prior to 1987 and no negative samples prior to 1990." AR 600–85, ¶ 10–4, states that "all documents or certi-

fied copies pertaining to all positive test results will be retained for 5 years. Negative results are kept for 2 years in accordance with AR 25–400–2." The ABCMR concluded: "[I]t appears that ... [plaintiff] was provided all drug results pertaining to him, despite his allegation.... This seems especially true since the available evidence shows that four of his urinalyses were negative."

4. Determine whether Army records reveal that plaintiff underwent any EMIT testing during the same period of time. Describe EMIT testing, and determine why such testing was conducted. If that information is not available, the ABCMR should determine the possible reasons for which plaintiff might have been required to undergo EMIT testing.

ABCMR: "The EMIT portable test kit is used to test urine specimens locally primarily for the purpose of culling out specimens that contain little or no evidence of drug use in order to reduce the number of specimens shipped to the laboratory. Because of quotas established by the Army, not all samples could be shipped to the drug testing laboratories. Fort Campbell would ship all prescreened positive samples and whatever amount of negative samples necessary to meet the quota of 1000 a month."

5. If any testing documentation for plaintiff's unit during the pertinent time period is no longer contained in the Army's records, the ABCMR should determine why these records no longer exist.

ABCMR: The ABCMR first stated that "[t]here is no requirement to maintain urinalysis results longer than 5 years, in accordance with Army Regulations 600–85 and 25–400–2."

The IG investigated why testing documentation records were no longer available by interviewing and obtaining statements from five individuals, including Mr. Davila, who had firsthand knowledge. Only Mr. Davila submitted a statement; the IG related the substance of what the other four had to say. The ABCMR noted that the Chief of the Identification and Training Branch of the Community Counseling Services at Fort Campbell, Kentucky, Mr. Davila, described the EMIT drug testing system procedure.

The IG reported that two former platoon leaders/executive officers, Captain Heyhurst and Captain Michael Woods, stated that, while they did not recall exact procedures for drug testing at the time, both felt that it was a random selection.

The IG reported that a former battalion commander, Lieutenant (retired) J.B. Gilreath, stated that urinalysis selection was "sent down to Company levels by the Battalion Executive Officer and the Drug and Alcohol NCO." The company would use that data to make its random selection of persons to be tested. The battalion commander related that the soldiers were chosen at random by either the last number or last two numbers of their social security numbers. Contrary to defendant's argument, however, the ABCMR did not conclude that the tests were initiated at the battalion, not the commander, level.

The Board observed that plaintiff had submitted records of six urine tests; that any other records have been destroyed under regular procedure; and that "[i]n the absence of any additional pertinent Army records regarding this matter, the Board must presume administrative regularity in this case."

6. Based upon its review of the evidence of record, the ABCMR should determine whether plaintiff was singled out for testing and the basis for its conclusion. If the ABCMR determines that plaintiff was singled out for testing, the ABCMR should further determine whether plaintiff is entitled to any relief and state the basis for its conclusion.

7. Regardless of the number of currently existing test results, the ABCMR should determine whether, if plaintiff was tested seven times during that period, the ABCMR considers that it is more likely than not that his commanders singled him out for testing and, if so, whether plaintiff is entitled to any relief. If plaintiff was tested 10 times during that period, state whether the ABCMR considers it more likely than not that his commanders likely sin-

gled plaintiff out for testing and, if so, whether plaintiff is entitled to any relief. The ABCMR shall state the bases for its conclusions.

ABCMR response to questions 6 and 7:

The IG reported that plaintiff's former first sergeant, 1SG(R) Edward Wright, stated that he could recall only one incident when plaintiff was "singled out" for a command referral urinalysis. The IG reported that to the best of Sgt. Wright's recollection, that referral was made based on the statement of a private first class assigned to the company who claimed that he had observed plaintiff smoking marijuana with other soldiers. The first sergeant could not recall the name of the private.

The Criminal Law Division within the JAG concluded that there was "insufficient evidence of record to conclude that [plaintiff] was singled out for urine testing." The JAG further stated that even if plaintiff were singled out for testing, relief still should be denied.

According to the JAG, the Military Rules of Evidence ("MRE") might have prevented the use of the results of a urinalysis in evidence against plaintiff at a court-martial if plaintiff could have shown that he was singled out for testing. However, plaintiff did not demand trial by court-martial. The MRE's do not apply to the administration of nonjudicial punishment, except in cases that involve the rules governing privileges which are not applicable to this case. The JAG also stated that MRE's do not apply to administrative separations as indicated by AR 635–200, ¶ 2–11. The ABCMR agreed that the MRE's do not apply to this case. Plaintiff also considers the JAG as correct on point and only presses in court the challenge that he was singled out for drug testing in violation of his fourth amendment constitutional rights.

In conclusion the JAG found that the evidence presented by plaintiff was not sufficient to show that he was singled out for urinalysis testing. The JAG recommended that the ABCMR reaffirm its previous decision and noted that even if plaintiff was singled out for urinalysis testing, the administration of nonjudicial punishment, fol-

lowed by administrative separation, was appropriate and no relief should be granted. The ABCMR adopted the JAG's recommendation.

In his renewed cross-motion for summary judgment, plaintiff requests restoration to active duty. He also requests that any disciplinary or adverse administrative actions taken as a result of the positive drug urinalysis of a specimen he submitted on August 21, 1984, be set aside; that all rights, privileges, and property he lost as a result of such actions be restored; and that all references to the positive urinalysis be deleted from his records. Alternatively, he requests that his General Discharge be upgraded to a fully Honorable Discharge.

## DISCUSSION

Defendant argues that the equitable doctrine of laches bars plaintiff's claim that the Army violated his constitutional right to freedom from unreasonable searches and seizures. Alternatively, defendant argues that the ABCMR's decision denying relief to plaintiff was not arbitrary or capricious, was not contrary to law or regulation, and was supported by substantial evidence. *Alberico v. United States*, 783 F.2d 1024, 1029 (Fed.Cir.1986) (citing *Guy v. United States*, 608 F.2d 867, 870 (1979)).

### 1. *Laches*

Defendant asserts that plaintiff purposefully delayed raising the question of whether he was illegally singled out by his two commanders for drug testing until after the commanders were no longer available to refute those charges, since both died in a 1985 plane crash. According to defendant, this delay was unreasonable and prejudiced its ability to defend against plaintiff's charges.

 Laches is a fairness doctrine by which relief is denied to one who has unreasonably and inexcusably delayed in the assertion of a claim. Failure to act promptly will operate as a bar to recovery where the delay results in injury or prejudice to the adverse party. The doctrine of laches is based upon considerations of public policy,

which require, for the peace of society, the discouragement of stale demands. *Cornetta v. United States*, 851 F.2d 1372, 1376 (Fed.Cir.1988) (en banc). It recognizes the need for speedy vindication or enforcement of rights, so that courts may arrive at accurate conclusions as to the truth. As an equitable defense, laches is applied apart from, and irrespective of, statutes of limitations, and has long been recognized to bar military pay claims. *Brundage v. United States*, 205 Ct.Cl. 502, 504, 504 F.2d 1382, 1384 (1974), *cert. denied*, 421 U.S. 998, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975). In order to meet the burden of proof when asserting the defense of laches in military pay cases, defendant must establish both that the claimant has inexcusably delayed raising his charges by filing suit and that it has been prejudiced by that delay. *Cornetta*, 851 F.2d at 1377–78.

Defendant contends that plaintiff had several opportunities to charge the two commanders with singling him out for drug testing, but chose not to do so. In 1983 plaintiff forwent an opportunity to bring such charges in a court-martial, as well as in an appeal of his punishment under Article 15. The Article 15 regulation authorizes individuals to present matters in defense, mitigation, and extenuation during the Article 15 proceedings. In 1984 plaintiff again forwent the opportunity for a court-martial or an appeal of his punishment under Article 15. There is no evidence that plaintiff levied the charges in his first application to the ABCMR. According to defendant, plaintiff unreasonably waited until his second application on September 29, 1987, to raise the issue of whether plaintiff's constitutional rights were violated by his commanders in targeting, or singling him out, to provide specimens for drug testing. For these reasons defendant takes the position that plaintiff's delay is unreasonable.

The second prong of the laches doctrine is that a claimant's delay has prejudiced defendant's ability to defend its case. Since plaintiff's two commanders were not alive to provide witness testimony by 1987 when plaintiff filed his second application with the Board, defendant maintains that the deaths of these two witnesses alone establishes the necessary prejudice. In addition, defendant argues that the passage of time has dimmed the memory of the remaining witnesses relating to frequency of urinalysis, thereby detracting from the effectiveness of the witnesses and prejudicing defendant's case. Defendant states that of the four witnesses interviewed regarding the testing procedure, the only common thread in their recollections is that three of the four, including the battalion commander and plaintiff's unit first sergeant, thought the selection was done at battalion, not at the unit, level and that the selection was random.

Plaintiff responds that defendant did not raise the issue of laches until its renewed motion for summary judgment and therefore waived this issue by not addressing it at the onset of this litigation. Plaintiff suggests that defendant now argues laches in an attempt to avoid the issue of whether plaintiff's constitutional rights were violated. According to plaintiff, his initial application for relief before the ABCMR was broad enough to include the constitutional basis for his lawsuit filed in the Claims Court. Plaintiff attempted to obtain a copy of his initial application to the ABCMR on June 9, 1986, approximately two months after he was notified of the ABCMR's decision that did not grant him full relief. Plaintiff has not been able to provide the court with a copy of the first application. In any event, plaintiff argues that because he was discharged approximately one year prior to the deaths of his commanders, it is reasonable to assume that his first application was submitted in sufficient time for the Army to have investigated his claims before the death of his commanders. Plaintiff concludes that any prejudice claimed by defendant is equally chargeable to defendant and should not enable defendant to invoke the laches defense.

■ The court rejects defendant's laches argument as itself untimely. It appears that the ABCMR only became aware of the commanders' deaths in connection with the IG's report of May 19, 1992, when the Board was formulating its response to the

court's December 23, 1991 remand order. However, this case was the subject of an earlier remand on February 1, 1991, on defendant's motion over plaintiff's opposition; a second Board decision of April 17, 1991, in response to that order; and full briefing on cross-motions for summary judgment between June and October 1991. The commanders were as dead in 1991 as they are today. If defendant had advised the court during the earlier proceedings that the Army was deprived of the enlightenment that these individuals presumably would have brought to bear, both the court's and the ABCMR's valuable resources, let alone plaintiff's and defendant's, would not have been absorbed by dealing with the merits of plaintiff's claims, framing the second remand order in late 1991, responding to that order, and briefing the merits anew. Similarly, the four individuals identified by the IG who suffer from diminished memories of events occurring in 1983–1984 presumably had the same infirmity in early 1991 when the court remanded the matter for the first time. Defendant cannot avail itself of the laches defense by unreasonably delaying in invoking it. The court therefore rejects the defense.

2. *Review of the ABCMR's decision to deny plaintiff relief*

■■■ In military pay matters, the court reviews a plaintiff's case "through the prism of a correction board." *Cohn v. United States*, 15 Cl.Ct. 778, 789 (1988). The scope of review is narrow: To overturn the Board's decision, plaintiff must prove by cogent and convincing evidence (1) a material legal error or injustice in the correction board proceeding and (2) an adequate nexus or link between the error or injustice and the adverse action. *Hary v. United States*, 223 Ct.Cl. 10, 15, 618 F.2d 704, 706 (1980). Plaintiff is required to shoulder the burden of showing "by cogent and clearly convincing evidence" that the ABCMR's initial decision was the product of a material legal error or injustice. *Hary*, 223 Ct.Cl. at 15, 618 F.2d at 706. Further, plaintiff must overcome the presumption that "administrators of the mili-

tary, like other public officers, discharge their duties in good faith." *Sanders v. United States*, 219 Ct.Cl. 285, 302, 594 F.2d 804, 813 (1979) (citations omitted). Although the court might disagree with the Board's decision, it cannot substitute its own judgment for that of the Board if reasonable minds could reach differing resolutions of the disputed matter. *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir.1983).

Contrary to plaintiff's overarching indictment of the Board's decision, it did not parrot the IG and JAG's advisory opinions. Uncommon to this court's experience, the ABCMR included its own evaluation of these reports. The court is convinced that the ABCMR put its collective mind to the matter at hand.

Plaintiff contends that he was tested more than six out of ten times between May 1983 and September 1984. The available records indicate that plaintiff was tested six out of 14 times that unit testing was ordered. The IG investigation revealed one additional command-directed test. Defendant maintains that in the circumstances plaintiff cannot show that he was singled out.

Plaintiff argues that subjecting him to more than six tests in the 20–month period was tantamount to singling him out in violation of the fourth amendment to the United States Constitution, citing *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), and *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). Defendant asks that the court not reach the constitutional issue.

■■■ The fourth amendment does protect members of the armed forces from unreasonable searches and seizures. *United States v. Muniz*, 23 M.J. 201, 204 (C.M.A.1987); *United States v. Stuckey*, 10 M.J. 347, 349 (C.M.A.1981). *See generally United States v. Brown*, 784 F.2d 1033, 1037 (10th Cir.1986); *Garrett v. Lehman*, 751 F.2d 997, 1002 (9th Cir.1985). However, the military's implementation of the

fourth amendment protection is different from that employed in civilian matters. In military cases Congress has the "primary responsibility for the delicate task of balancing the rights of servicemen against the needs of the military." *Solorio v. United States,* 483 U.S. 435, 447, 107 S.Ct. 2924, 2931, 97 L.Ed.2d 364 (1987).

The United States Court of Military Appeals, the court recognized by both the Congress and the Supreme Court as having a particular expertise in this area,[7] has explained that the military search authorization procedure is a finely tuned accommodation of the servicemember's privacy interests grounded in the fourth amendment and the specific needs, dictated by military necessity, for good order and discipline in the armed forces. *United States v. Chapman,* 954 F.2d 1352, 1369 (7th Cir. 1992); *see United States v. Stuckey,* 10 M.J. 347, 358–61 (C.M.A.1981). The relationship between a serviceman and his commander is different from the relationship between a civilian and a magistrate. Servicemen have less expectation of privacy while living on a military installation, and a military commander has considerably more interest in being informed of all activities in the area of his command. The Court of Military Appeals in *Stuckey* noted: "A military commander has responsibilities for investigation and for law enforcement that a magistrate does not possess. Also, he has responsibilities for the welfare and combat readiness of the personnel under his command." 10 M.J. at 359. A servicemember's rights must be conditioned to meet the demands of military duty. *Parker v. Levy,* 417 U.S. 733, 743–49, 94 S.Ct. 2547, 2555–58, 41 L.Ed.2d 439 (1974).

The cases cited by plaintiff involve government-conducted drug testing, not the military itself. Nevertheless, they are somewhat analogous in that the fourth amendment rights of government employees, as with military servicemen, are balanced against the needs of the Government and are more restricted than those of private citizens. It is not necessary in this case, however, to consider the limits of fourth amendment protection to military servicemen. Rather, the key issue is whether plaintiff can meet his burden of proof by showing that he was unfairly singled out for drug testing.

█ As evidence that he was singled out for drug testing, plaintiff submitted to the ABCMR, in connection with the second remand, a statistical analysis prepared by Jim Ridenhour, a mathematics professor, who stated that the probability of a soldier being selected six or more times in nine independent trials when 12 individuals are selected from a possible pool of 120 individuals is one in 10,000. Affidavit of Jim Ridenhour, June 16, 1992. The ABCMR took notice of this analysis, but stated that its conclusions were "based on selective data and therefore hypothetical."[8] The IG reported that plaintiff's former first sergeant Edward Wright stated that he himself has been selected "at least six times." The ABCMR concluded that plaintiff "has not presented sufficient evidence to support his claim that he was repeatedly singled out by his commanders to provide urine specimens." The ABCMR characterized plaintiff's assertion of being singled out for additional testing as "self-serving" and "made in an effort to bolster his case."

The first issue addressed on the latest remand was whether the ABCMR's finding that plaintiff underwent nine drug tests was accurate. Plaintiff claimed that he was required, during the same timeframe, to submit to further urinalysis testing using the EMIT Portable Test Kit at the division drug office. In support of its claim, plaintiff had supplied the affidavits of Messrs. Davila and Bonner.

Mr. Davila opined that "[plaintiff's] selection to be tested was not random, but intentional." Affidavit of Cosme A. Davi-

---

**7.** *See Schlesinger v. Councilman,* 420 U.S. 738, 758, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591 (1975); *Noyd v. Bond,* 395 U.S. 683, 694, 89 S.Ct. 1876, 1883, 23 L.Ed.2d 631 (1969); *see also Middendorf v. Henry,* 425 U.S. 25, 66, 96 S.Ct. 1281, 1302, 47 L.Ed.2d 556 (1976) (Marshall, J., dissenting).

**8.** The court agrees with defense counsel that the Board probably meant "theoretical."

la, Sept. 27, 1991, ¶ 6. According to Mr. Davila:

> The frequency of [plaintiff's] urinalysis testing was unlike other soldiers at Fort Campbell, except those in the Drug Rehabilitation Program. Other factors that show that ... [plaintiff's] selection for urine testing was not random is the fact that all seven of the tests were random tests not unit sweeps, therefore it is improbable that.... [plaintiff] would have been randomly selected this many times by his chain of command, the unit ledger from the May 3, 4 test and the electronic message showing the results indicates a unit sweep for Headquarters and Headquarters Company (HHC), 1/506th; however, [plaintiff] was tested and was assigned to Company C, 1/506th, thus he should not have been included in the HHC, 1/506 unit sweep.

*Id.*

Mr. Bonner's affidavit also suggests that plaintiff may have participated in more than six drug tests in the relevant time period. Mr. Bonner at that time served as Health Aide with the Drug and Alcohol Section, Fort Campbell, Kentucky. His position entailed collecting urine specimens from various units at Fort Campbell and from the urine prescreening facility and processing them for shipment to the Army Drug Labs and maintaining all records pertaining to the urinalysis section, including both a positive ledger and a negative ledger consisting of all test results reported from the Army drug labs. Plaintiff would give urine specimens at the urinalysis station adjoining Mr. Bonner's office whenever he missed a unit urinalysis test or when he was tested using the EMIT portable test kit. On these occasions the entry would not be recorded on plaintiff's unit ledger, but, rather, on one of Mr. Bonner's office ledgers. If the specimen came back negative for drugs, Mr. Bonner would have entered the result on his office negative ledger. Mr. Bonner recalled that plaintiff was escorted to the urinalysis station adjoining his office "on more than one occasion" to provide a specimen for testing. Affidavit of Leon H. Bonner, Sept. 27, 1991, ¶ 3. During June 1986 Mr. Bonner

recalled reviewing plaintiff's positive ledger in response to a FOIA request from plaintiff. Mr. Bonner was not requested to review the negative ledger and did not do so. Any drug tests using the EMIT portable test kit would have appeared on one of Mr. Bonner's office ledgers. However, in accordance with standard military procedure, any negative urinalysis was destroyed after two years.

Plaintiff contends that the "ABCMR did not follow the Court's call and in effect let the Defendant, through the Office of the Judge Advocate General determine the key issues which the Court wanted the ABCMR to determine...." Plf's Counter–Statement of Facts, filed Dec. 2, 1992, at 3. Plaintiff argues that he has shown a material legal error or injustice in the ABCMR's proceedings and that error is one of constitutional proportions.

The ABCMR considered Mr. Davila's affidavit and later statement. His affidavit stated that plaintiff's numerous tests were unusual because the only soldiers who were regularly tested during the timeframe in question were soldiers in the drug rehabilitation program or soldiers who were given command directed tests to ascertain their fitness for duty or for referral to the rehabilitation program. The ABCMR viewed Mr. Davila's affidavit testimony as lacking specificity because it failed to state the number of drug tests allegedly submitted by plaintiff. In addition, Mr. Davila did not explain what he considered were normal testing procedures. Due to its lack of specificity, the ABCMR stated that Mr. Davila's affidavit must be "taken at face value." In his statement submitted to the IG, Mr. Davila outlined the record retention procedures for drug testing and indicated that testing at his office was not always recorded in the ledger. The Board's discussion of record retention policies indicates that this statement was also considered.

The record reveals that the ABCMR also considered Mr. Bonner's affidavit, noting that Mr. Bonner was the Army official who had acted on plaintiff's FOIA request. Mr. Bonner provided only records of positive urinalysis results since he was not instruct-

ed to search for records of negative results. The ABCMR noted that the negative test results were destroyed in accordance with military procedure after two years. In the Board's view, the fact that Mr. Bonner's affidavit was given on September 27, 1991, in regard to events during the 1983–1984 time period, tempered Mr. Bonner's ability to recall specific details about plaintiff's drug testing. He could not recall the exact numbers of specimens allegedly submitted by plaintiff. In view of this lack of specificity, coupled with evidence of the negative urinalysis results in the record that plaintiff was able to provide, the ABCMR deemed Mr. Bonner's testimony speculative.

Plaintiff has produced a statistical study and two witnesses who suggest the possibility that plaintiff underwent urinalysis testing in addition to the six tests of record. However, in view of the passage of time and the lack of specificity, this evidence is not sufficient for the court to overturn the ABCMR's decision. Records of any negative drug test results that may have strengthened plaintiff's contention that he was singled out for drug testing were destroyed in accordance with standard military procedure by late 1986. The timing of plaintiff's FOIA request would not have impacted significantly the retention of records for additional tests. It was received on June 18, 1986, and answered on June 27, 1986, when all but slightly over two months' of records of negative test results would have been destroyed. There is no basis to infer that the Army withheld extant records. Not until September 29, 1987, did plaintiff file his second application alleging that he had been singled out for drug testing. The Army cannot be faulted for adhering to its standard record retention procedure. Plaintiff's FOIA request also asked for other records relating to drug testing, which would have been retained for five years. The Bonner and Davila affidavits do not support an inference that other pertinent, undisclosed records supporting their recollections and plaintiff's existed at one time.

The ABCMR has acknowledged expertise in matters involving military procedure.

Where there is no apparent abuse of discretion, the reviewing court must respect the ABCMR's decision.

Due to the absence of records, for which the Army cannot be faulted, plaintiff has failed to substantiate his claim that he was singled out for drug testing by cogent and clearly convincing evidence. The court upholds the ABCMR's decision.

## CONCLUSION

Accordingly, based on the foregoing, defendant's renewed motion for summary judgment is granted, and the Clerk of the Court shall dismiss the complaint.

IT IS SO ORDERED.

No costs.